## COMPANIA TRANSATLANTICA CENTRO-AMERICANA, S. A., v. ALLIANCE ASSUR. CO., Limited, et al.

District Court, S. D. New York.

July 27, 1943.

Haight, Griffin, Deming & Gardner, of New York City (Edgar R. Kraetzer, of New York City, of counsel), for libellant.

Duncan & Mount, of New York City (Henry W. Dieck, of New York City, of

counsel), for respondent Underwriters' at Lloyd's London.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley, of New York City, of counsel), for respondent Eagle Star Ins. Co., Limited, et al.

RIFKIND, District Judge.

The libellant seeks to recover a loss alleged to be covered by several contracts of marine insurance issued by respondents.

The libellant's vessel, the Panamanian, was lying in Bolivar Roads, Galveston, Texas. Shortly after midnight, on October 4, 1940, sea water was observed entering the vessel from the port hotwell overflow pipes into the engine room. Efforts to stop the inflow were unsuccessful because the officers on board were unable to locate its source. In the early morning hours with the aid of tugs, the vessel was pushed onto a mud bank to prevent its sinking. The cause of the ship's misadventure was not discovered until 3:00 A. M. of October 7th. Meanwhile large quantities of sea water had entered the engine room and holds.

The ship was insured under time policies of hull insurance running from March 15, 1940, to March 15, 1941. Claiming that the damage it had suffered was caused by the perils insured against, the libellant instituted these proceedings in the admiralty.

The preliminary question is whether the policies of insurance are governed by English or American law. The following facts have a bearing upon the inquiry:

1. The vessel was of Panamanian registry and its owner was a Panamanian corporation.

2. The owner maintained its office in New York.

3. The owner employed an American insurance broker who, in turn, employed two English brokers to place the insurance.

4. The policies were made in England.

5. All the respondent underwriters are English.

6. Each of the policies is on an English form to which is attached the American Institute Time (Hulls) Form.

7. The premium, amount of insurance and the valuation are all stated in dollars.

8. The time of commencement and termination of the policies is expressed in New York time.

9. The premiums were paid in London.

10. The loss was made payable to the English brokers.

11. A previous loss under the same policies was paid in London.

12. The American Institute Form attached to the policies provided inter alia as follows: "General Average, Salvage and Special Charges payable as provided in the contract of affreightment, or failing such provision, or there be no contract of affreightment, payable in accordance with the Laws and Usages of the Port of New York. Provided always that when an adjustment according to the laws and usages of the port of destination is properly demanded by the owners of the cargo, General Average shall be paid in accordance with same."

In determining which law shall apply, all these factors must be taken into account in an effort to find the actual or presumed intent of the parties. The Brantford City, D.C.S.D.N.Y.1886, 29 F. 373, 391; cited with approval in Liverpool and Grand Western Steam Co. v. Phenix Insurance Co., 1889, 129 U.S. 397, 461, 9 S.Ct. 469, 32 L.Ed. 788; Marine Insurance Co. v. McLanahan, 4 Cir., 1923, 290 F. 685; Spurrier v. La Cloche, 1902 A.C. 446. In weighing the significance of the several factors, the authorities seem to treat the place of making the contract and the place of performance as entitled to special consideration. Thus, in London Assurance v. Companhia De Moagens Do Barreiro, 1897, 167 U.S. 149, 160, 17 S. Ct. 785, 789, 42 L.Ed. 113, the court said: "Generally speaking, the law of the place where the contract is to be performed is the law which governs as to its validity and interpretation. Story, in his work on Conflict of Laws, section 280, says: 'But where the contract is, either expressly or tacitly, to be performed in any other place, there the general rule is, in conformity to the presumed intention of the parties, that the contract, as to its validity, nature, obligation, and interpretation, is to be governed by the law of the place of performance. This would seem to be a result of natural justice. * * * The rule was fully recognized and acted on in a recent case by the supreme court of the United States, where the court said that the general principle in relation to contracts made in one place to be executed in another was well settled; that they are to be governed by the law of the place of performance.'"

And in Liverpool & G. W. Steam Co. v. Phenix Insurance Co., 1889, 129 U.S. 397, 458, 9 S.Ct. 469, 478, 32 L.Ed. 788, the court said: "This review of the principal cases demonstrates that, according to the great preponderance, if not the uniform concurrence, of authority, the general rule that the nature, the obligation, and the interpretation of a contract are to be governed by the law of the place where it is made, unless the parties at the time of making it have some other law in view, requires a contract of affreightment, made in one country between citizens or residents thereof, and the performance of which begins there, to be governed by the law of that country, unless the parties, when entering into the contract, clearly manifest a mutual intention that it shall be governed by the law of some other country."

■ In the case at bar the contracts were made in England and were performable in England. The use of an American form is, of course, "one circumstance to indicate" that an American contract was intended. The Brantford City, supra, 29 F. at page 392. However, I believe it is outweighed by the two other factors I have mentioned.

■ Respondents stress the reference in the contract to the laws and usages of the Port of New York as controlling, under certain circumstances, in the matters of general average, special charges and salvage. They point to the apparent anomaly of an English contract calling for the application of the laws and usages of an American port. The anomaly, however, is only apparent. The needs which gave rise to these general average clauses have been[*] stated in International Navigation Co. v. Sea Insurance Co., 2 Cir., 1904, 129 F. 13. And it is only natural that an American port should be named in an American form. Respondents' argument is, therefore, no more than a subdivision of the point that an American form was used. That, it seems to me, is insufficient to overcome the presumed expectation of the parties that a contract made by a non-American corporation respecting a non-American ship, with an English corporation, in England, and performable on all sides in England, shall be construed, not in accordance with American law, but in accordance with English law.

The libel alleged that the damage was "caused by the perils of the sea, or other like perils and/or latent defect and/or the negligence of the master, mariners and engineers without any want of due diligence as to said latent defect and/or said negligence by the owners of said vessel or by the managers thereof". Against loss or damage so caused the respondents had insured the libellant. The answers put in issue the truth of the foregoing allegation concerning the cause of the damage and the inquiry must, therefore, be directed to the ascertainment of that fact.

The Panamanian was built in 1904 as a passenger vessel. She was of 15,575 gross tonnage and had four steel decks and a shelter deck. Her power was derived from two quadruple expansion engines which drove her twin screws. Her dimensions were 615 feet in length, 65 feet in beam and 51 feet in depth. At an unstated time in her history she was converted to the carriage of freight. Thereafter, for five or six years prior to 1940 the Panamanian was out of use and she lay at anchor in New York. In 1940, she was repaired, made one or more voyages attended by mishaps not here relevant and finally after further repairs had been effected she reached Texas City. There she took on fifty or sixty thousand drums of oil, proceeded to Galveston where she bunkered, and then lay in anchor in Bolivar Roads when the present misadventure befell her.

It is not disputed that the water which flooded the vessel entered through the port vapor discharge valve, proceeded down the vapor pipe to the hotwell, and escaped out of the hotwell, through the vent pipes, into the machinery space or engine room. The function of the vapor discharge valves is to permit the ejection of condensate and vapor when the engine action is such as to build up pressure in the vapor pipe. That usually occurs when the engines are started up after a period of idleness or when the engines are used intermittently.

The purpose served by the overboard vapor discharge valve is more usually accomplished by a simple inverted U-shaped pipe which spills the excess condensate onto the floor plates of the engine room or into a funnel leading to a tank. The vapor discharge valve on the Panamanian consisted of a bronze ring or seat 3½ inches deep and having an inside diameter of 11 inches. Into this seat was fitted a bronze valve disc shaped like a seven legged Chinese teakwood table. This disc weighed 20 pounds and its legs or fins .

measured 4¾ inches in length. It will be noted, therefore, that when the valve disc was in place the legs or fins extended 1¼ inches below the bottom level of the seat.

The weight of the disc was such as to cause it to fall into a closed position. In addition, the valve was subjected to pressure from a heavy spring fitted into its upper surface in order to restrain it when opening and to accelerate its closing.

In normal operation the valve opened but slightly. It merely fluttered. The lack of wear on the lower extremities of the legs or fins indicated that the valve rarely opened as much as an inch.

It was the jamming of this valve in an open position which admitted the sea water into the vapor pipe.

There was a gate valve in the line connecting the hotwell and the air pump. The gate valve had to be kept open when the engines were in operation. Had this valve been closed when the vapor discharge valve failed, the incoursing waters would have been confined to the vapor pipe. Closing of the gate valve would have stopped the flooding of the engine room even if the engineer's mistaken diagnosis that the interior lines of the condenser had collapsed had proved true. However, no one closed the gate valve.

When, after several days, the true cause of the difficulty was discovered, it took but a stroke on the spindle above the valve to release the valve disc and to shut the breach in the ship's sea skin.

Against this general background we may consider the three major questions at issue:

1. Was the casualty caused by a peril of the sea?

2. Was it caused by a latent defect?

3. Was it caused by the negligence of the engineers? As to 2 and 3 we have the subsidiary question whether there was a want of due diligence on the part of the owners or managers.

Prima facie, the accidental incursion of sea water into a vessel, through an opening not intended for the purpose, is a peril of the sea. Canada Rice Mills, Ltd., v. Union Marine and General Insurance Co., Ltd., 1941, A.C. 55, 68. It does not follow that the insurer is liable for loss attributable to every incursion of sea water. The underwriter may show that the loss was not caused by a peril of the sea but by the intentional scuttling of the vessel, P. Samuel & Co., Ltd., v. Dumas, 1924, A.C. 431, by the inherent unfitness of the vessel, Grant, Smith and Co. v. Seattle Construction and Dry Dock Co., 1920, A.C. 162, by the exhaustion of the vessel's useful life through wear and tear, Wadsworth Lighterage and Coaling Co., Ltd., v. Sea Insurance Co., Ltd., 1929, 35 Comm.Cas. 1, or by an explosion in the cargo, The G. R. Booth, 1898, 171 U.S. 450, 19 S.Ct. 9, 43 L.Ed. 234.

In the case at bar respondents claim that the vapor discharge valve was unseaworthy, that, as a result of many years of operation, the pounding of the disc in the seat had caused the lip of the seat to close in, thus preventing the free movement of the valve in its bore, that this defect was the product of wear and tear and that the casualty was proximately caused by this lack of seaworthiness and wear and tear and not by a peril of the sea. There was also testimony on behalf of the respondents that the seat was not a true circle but slightly oval, but no opinion was expressed whether that was the original condition of the valve or the product of the ravages of time. In any event, respondents' witnesses joined in testifying that the diameter of the bore was $\frac{1}{32}$ of an inch smaller at the top than at the bottom. Both libellant's and respondents' witnesses agreed that the valve was free to move several inches vertically before it jammed.

The respondents' theory of what occurred is stated in its brief thus: "We understand that the parties are in accord that the machinery space of the 'Panamanian' flooded because the disc of the port vapor discharge valve stuck open; that either as the result of a slight port list or the lapping of some small wave on the ship's side, water found its way through the open valve, over the top of the diaphragm, into the diaphragm chamber and thence down the vapor pipe to the hotwell, thus setting up a siphon and causing water to pour into the vessel until the flow was stopped by the closing of the vapor valve."

The suggestion of a siphon is necessary because the diagrams of the vessel's structure reveal that the top of the diaphragm was above the level of the water. I accept this statement as the only plausible explanation of what occurred, especially in view of the fact that the engines had not been in operation from September 30th, so that the valve must have been open

continuously from that time to the time of the inflow of the water on October 4th.

We have, then, the following conjunction of events: Whereas, normally, the valve rose in its seat less than an inch, on September 30th, the amount of condensate had so accumulated as to drive the disc up several inches, and with such force that it stuck and remained open; that for several days nothing untoward occurred; that on October 4th the vessel listed slightly to port or encountered a passing wave; that a siphon was established between the sea and the vapor line over the diaphragm; that water poured out of the hotwell vents which could have been shut out effectively by closing the gate valve in the line between the hotwell and the air pump; that the gate valve was not closed; and damage ensued.

■ To this set of circumstances we can apply the test ascribed to Lush, J., in Ballantyne v. MacKinnon, 1896, 2 Q.B. 455, 460: "When considering what was or was not a peril of the sea, that the question was whether the loss arose from injury from without or from weakness from within and that what underwriters insured against were casualties that might happen, and not consequences which must happen". I take it that is what the court meant by the word "fortuitous" in Canada Rice Mills, Ltd. v. Union Marine and General Insurance Co., 1941, A.C. 55, 69. See Arnould, Marine Insurance, 12th Ed., § 775. Indeed, it is but a summary of Lord Bramwell's remarks in The Xantho, 1887, 12 A. C. 503, 513: "Was it by a peril of the sea that the defendants' ship foundered? The facts are, that the sea-water flowed into her through a hole, and flowed in such quantities that she sank. It seems to me that the bare statement shews she went to the bottom through a peril of the sea. If the hole had been small, there being a piece of bad wood, a plank starting, or a similar cause, it would be called a leak, and no one would doubt that she foundered from a peril of the sea. * * * It would be strange if a plank started, and the vessel went to the bottom in consequence, that it should be held, 'Oh, the loss is not by perils of the seas, but by bad carpentering.' Let there be no doubt. I do not say that in such case the freighter might not complain that his goods were carried in an unseaworthy ship. All I say is, that the loss would be by perils of the seas".

■ Applying this test, I think the casualty was the result of a fortuitous entry of the sea water; that it was an event which might and did happen, not one which must happen. The very fact that the vessel had been voyaging without mishap attributable to the valve, whereas the defect of the valve as testified by respondents' witnesses, must have affected it for a long time, is proof positive that the casualty was in the realm of the possibilities and not of the inevitabilities.

True it is that neither storm nor abnormal wave nor weather contributed to the disaster. But these are not the only perils of the sea. Small waves are likewise "of the sea". Surely the casualty could not have occurred on land. In The Stranna, C.A.[1938], P. 69, 83, the court said: "But it was also a peril of the sea and not merely a peril on the sea. It could not have happened on land; it was a happening which is characteristic of the sea, and of the behaviour of ships."

Two statutes have a bearing on the issue. § 55 of the British Marine Insurance Act 1906, provides:

"(1) Subject to the provisions of this Act, and unless the policy otherwise provides, the insurer is liable for any loss proximately caused by a peril insured against, but, subject as aforesaid, he is not liable for any loss which is not proximately caused by a peril insured against.

"(2) In particular,—* * * (c) Unless the policy otherwise provides, the insurer is not liable for ordinary wear and tear, ordinary leakage and breakage, inherent vice or nature of the subject-matter insured, or for any loss proximately caused by rats or vermin, or for any injury to machinery not proximately caused by maritime perils."

§ 39(5) of the same provides: "In a time policy there is no implied warranty that the ship shall be seaworthy at any stage of the adventure, but where, with the privity of the assured, the ship is sent to sea in an unseaworthy state, the insurer is not liable for any loss attributable to unseaworthiness".

■ It is true that, notwithstanding the absence of warranty as to seaworthiness, the underwriter may show that the loss arose, not from a peril insured against, but directly from the unseaworthy condition in which the vessel sailed. Arnould,

Marine Insurance, 12th Ed., § 799. The facts of the case at bar do not fit into the category of cases on which Arnould relies. It is one thing to relieve the underwriter where the vessel is lost because it has reached the end of its useful life, Wadsworth Lighterage and Coaling Co., Ltd. v. Sea Insurance Co., Ltd., supra. It is quite another and untenable proposition to suggest that it be similarly relieved of liability because a valve disc which had functioned adequately was driven more than three times its accustomed distance and jammed. Even if the valve can be said to have been unseaworthy, it does not follow that the vessel's casualty was not the product of a peril of the sea. The remarks of Lord Bramwell already quoted from The Xantho, supra, seem peculiarly apposite. See also Dudgeon v. Pembroke, 1877, 2 A.C. 284, 296.

To say that unseaworthiness, per se, is a good defense renders meaningless the English doctrine that in a time policy there is no implied warranty that the ship shall be seaworthy at any stage of the adventure. As I read the English authorities they go no further than this: that the insurance cannot be recovered where the unseaworthiness negates the inference that the ship's casualty was caused by the insured perils.

A corresponding analysis disposes of respondents' reliance upon § 55 of the Marine Insurance Act. Subdivision c of the section itself goes no further than to prescribe that unless the policy otherwise provides the insurer is not liable for ordinary wear and tear. Were the libellant seeking to recover damages for the deterioration of the valve, the statute would constitute a complete defense. Arnould, supra, § 775. Where, however, the relation of wear and tear to the casualty is such as to exclude the perils of the sea as its cause, then the insurer is free of liability because the insured contingency has not occurred. At most we have at bar a situation where undiscovered wear and tear made the jamming of the valve possible—not certain; and the jamming of the valve made the incursion of water into the hotwell possible not certain; and the incursion of water into the hotwell made the flooding of the vessel possible not certain. What we have, therefore, is a loss through perils of the sea.

As to the remaining questions: I find that libellant has failed to establish that the loss was caused by a latent defect. I also find that the engineers were negligent in failing to close the gate valve. Davidson v. Burnand, L.R. (1866-69) 4 Court of Common Pleas 117. Had they performed that simple operation the casualty would not have occurred. Since there was no want of due diligence by the owners or managers of the vessel this finding affords an independent ground of recovery under the policy.

Decree for libellant.