George H. LANDRY

v.

**STEAMSHIP MUTUAL UNDERWRIT-
ING ASSOCIATION, Limited.**

No. 58–32–W.

United States District Court
D. Massachusetts.

Sept. 8, 1959.

Ely, Bartlett & Brown, John Parker, Boston, Mass., for plaintiff.

Kneeland & Splane, James A. Whipple, Boston, Mass., for defendant.

WYZANSKI, District Judge.

This is a libel by a shipowner, holding a Protection and Indemnity (P & I) policy, against an insurer. He seeks indemnification for amounts he paid to satisfy a judgment entered against him and a vessel which he owned in a case in which his vessel was adjudged at fault in a collision with another vessel. He also seeks to recover his loss of profits on the vessel during the time it was under arrest in that collision case. The questions raised involve the construction of clauses in this particular P & I policy.

The following 22 numbered paragraphs are findings of fact.

1. Libellant was the owner of the Mary J. Landry from a date before June 27, 1956 until some time in June 1958.

2. June 27, 1956 respondent, incorporated under English law, and doing business in England, issued to libellant a P & I policy. Ex. 1. The policy is "in respect of the vessel 'Mary J. Landry' * * * (Valued $20,000) during the period commencing 17th May, 1956 and ending 16th May 1957."

3. The insurer binds itself to make good to the policyholder "all such Liabilities and Expenses as he shall become liable to pay and shall have in fact paid in respect to the Protection and Indemnity Risks covered under the Rules specified."

4. Rule 1 of the policy makes this provision:

"(d) Loss of or damage to any other vessel or craft or to the freight thereof or property thereon, caused by collision with the vessel named herein, in so far as such liability would not be covered by insurance under the standard form of policy on hull, machinery, etc., issued by the American Marine Insurance Syndicate (including the four-fourths Running Down Clause)."

5. Rule 2 of the policy provides that under these Rules the following matters are excepted:

"Claims for any loss, damage, liability or expense which would be payable under an insurance under the present standard form of policy of the American Marine Insurance Syndicate on hull and machinery, etc. * * * and sufficient in amount to pay such loss, damage, liability or expense in full."

6. The reference in Rule 1 to the "standard form of policy on hull, machinery, etc., issued by the American Marine Insurance Syndicate (including the four-fourths Running Down Clause)", and the shorter reference in Rule 2 to the "standard form of policy of the American Marine Insurance Syndicate on hull and machinery etc." are references to policies which in their printed provisions conform to Exhibits 2 and 3. Such a standard form of hull policy is issued to the owner of a vessel to protect him, amongst other risks, against *certain* risks of loss he may sustain if he or his vessel is held accountable in a proceeding brought on account of a collision which his vessel caused another vessel to sustain.

7. The applicable collision clause in the standard American hull policy, as illustrated by Exhibits 2 and 3, reads as follows:

"And it is further agreed that if the Vessel hereby insured shall come into collision with any other Ship or Vessel and the Assured or the Charterers or the Surety in consequence of the insured Vessel being at fault shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect of such collision, we, the Underwriters will pay the Assured, or the Charterers, or the Surety, whichever shall have paid, such proportion of such sum or sums so paid as our respective subscriptions hereto bear to the value of the Vessel hereby insured, provided always that our liability in respect to any one such collision shall not exceed our proportionate part of the value of the Vessel hereby insured. And in cases where the liability of the Vessel has been contested, or proceedings have been taken to limit liability, with the consent in writing of a majority (in amount) of Hull Underwriters, we will also pay a like proportion of the costs which the Assured or Charterers shall thereby incur, or be compelled to pay."

8. In addition to the P & I policy now in suit, libellant Landry had on March 15, 1957 two effective standard hull policies with collision clauses like the one already quoted. Both policies were for the period May 17, 1956 to May 17, 1957. One, Exhibit 2, was for $6,000 declared to be "part of $20,000". The other, Exhibit 3, was for "$14,000 on Hull and Machinery etc. valued $20,000."

9. On March 15, 1957, while the P & I policy and the hull policies were in effect, the Mary J. Landry collided with and sank the fishing vessel B & E. B & E, Inc., the owner of the B & E, filed a libel in admiralty in this Court against the Mary J. Landry *in rem* and against George H. Landry *in personam*. That case, Admiralty No. 57–31–A was assigned to Judge Aldrich.

10. In Adm. 57–31–A pursuant to process, B & E, Inc. caused the Mary J. Landry to be arrested by the United States Marshal in New Bedford on August 28, 1957 for the claimed amount of $100,000. The hull underwriters stood ready and willing to cause a surety bond or letter of indemnity in the amount of $20,000 to be executed to release the vessel Mary J. Landry from arrest. August 30, 1957 Landry requested the P & I underwriter (The Steamship Mutual Underwriting Association, Ltd., respondent in the instant case) to participate in a bond or letter of indemnity which together with the amount of the hull coverage would enable the vessel to be released from arrest. See Stipulation of June 22, 1959 in the instant case. By letter dated September 3, 1957, the P & I underwriter refused to participate in any bond or letter of indemnity.

11. September 9, 1957, following a hearing, Judge Aldrich reduced the amount of the security to release the Mary J. Landry to $27,000. His order states "Amount limited to $27,000."

12. September 27, 1957, the parties in Adm. 57–31–A agreed that the Mary J. Landry might be released from the marshal's custody upon the posting of a $20,000 surety bond. October 16, 1957, a surety bond of $20,000 having been filed, the Court released the Mary J. Landry to George H. Landry, the owner.

13. From the records of this Court in Adm. 57–31–A it appears that on November 19, 1957, following a hearing, Judge Aldrich filed in that case, The B & E, Inc. v. The Mary J. Landry, D.C., 157 F.Supp. 155, 156, an opinion in which he found the Mary J. Landry "solely at fault for the collision." The opinion concludes with the paragraph that "The matter of damages, and the libellee's claim to limit, will await further hearing."

14. March 10, 1958 Judge Aldrich filed a further memorandum, after hearing. This memorandum recites that it had "been previously determined that libellant [B & E, Inc.] is entitled to recover the value of its vessel, the B & E,

and its catch, and, if material, that respondent is entitled to limit the recovery to the value of its vessel, the Mary J. Landry and its 'freight', which I take to include its catch." [Judge Aldrich does not state when it was determined that respondent was entitled to limitation of liability.] Judge Aldrich's March 10, 1958 memorandum then finds that: (a) on the date of the collision the B & E was worth $20,000, its gear and supplies were worth $1,970, and its cargo was worth $1,000; and (b) the Mary J. Landry was worth more than the B & E and that the Mary J. Landry with her catch was "worth no less than $24,000. No further finding is called for." He ordered a "decree for libellant in the amount of $22,970 with interest at 6% from March 16, 1957 and costs."

15. On the same day as he filed his memorandum, March 10, 1958 Judge Aldrich entered a final decree which states that "in accordance with the Memorandum of the Court, March 10, 1958, it is Ordered, Adjudged and Decreed that libelant B & E Inc. recover from respondents above named [the vessel Mary J. Landry and George H. Landry] the amount of $22,970 plus interest at 6% from March 16, 1957 amounting to $1,-355.23 making a sum of $24,325.23, and libelant to recover its costs, taxed at $318.89." It will be observed that the final decree does not expressly repeat the determination that George H. Landry is entitled to limitation to the value of his vessel and freight, but the decree does incorporate by reference the memorandum which makes that determination. It will further be observed that neither in the final decree nor in the memorandum is there any finding as to the value of the Mary J. Landry except that "the Landry was worth more than the B & E," and the B & E was worth $20,000 and its gear and supplies were worth $1,970 and the Landry with her catch was worth no less than $24,000.

16. May 7, 1958 B & E Inc. procured an execution of the decree of March 10, 1958. This execution covering the

amount of the final decree, interest thereafter, and costs amounted to $24,708.76.

17. May 19, 1958 the hull underwriters paid B & E Inc. $20,000.

18. June 20, 1958 Landry personally paid B & E Inc. $4,708.76.

19. For some reason not explained, under date of June 17, 1958, three days before Landry paid the $4,708.76, B & E Inc. filed in this Court a letter stating that the execution was satisfied in full.

20. In the instant case, evidence was offered as to the fair market value of the hull, machinery etc. of the Mary J. Landry. The testimony before me indicates that the value was the same at all material dates, including the dates when the hull policies were effectuated, when the P & I policy was effectuated, when the Mary J. Landry collided on March 15, 1957 with the B & E, and when the Mary J. Landry was released from the marshal's custody. Libellant Landry placed the value at $18,000 to $20,000. A disinterested marine surveyor, Edward Gardenstone placed the value at $20,000. And it was shown that the vessel was sold in June, 1958 at $16,000. Insofar as the evidence before this Court rather than the ruling of Judge Aldrich controls, this Court finds that at all material times the fair value of the hull, machinery, etc. of the Mary J. Landry was $20,000.

21. This Court finds that at the time of the collision the fair value of the catch on board the Mary J. Landry was "over $3,300". R. 21.

22. If the Mary J. Landry had not been under arrest from August 30, 1958 (the date Landry requested the P & I underwriter to post bond for the release of the vessel) until September 27, 1957 (the date when B & E, Inc. agreed that the vessel might be released upon the posting of a $20,000 bond, that is, the time when it became immaterial whether the P & I underwriter was prepared to post a bond in addition to the $20,000 which the hull underwriters had always been prepared to post), the Mary J. Landry would have earned for George H. Landry profits of several thousands of dollars.

Upon the basis of the foregoing findings this Court reaches the following conclusions of law.

■ 1. In construing this P & I policy the initial question is what law governs. Since England was the place where the contract was made, and where the insurer was incorporated and did business, and since there is no indication that the parties intended that any law other than English law should govern, English law governs the interpretation and construction of the contract. Compania Transatlantica Centroamericana, S. A. v. Alliance Assur. Co., D.C.S.D.N.Y., 50 F.Supp. 986. Cf. Wetherell Bros. Co. v. United States Steel Co., 1 Cir., 200 F.2d 761, 763. See Notes 64 Harv.L.Rev. 446, 72 Harv.L. Rev. 1154. Restatement, Conflict of Laws §§ 332, 346. However, since there do not seem to be any English authorities which are precisely in point, the substantive questions must be resolved largely upon general principles of construction which are not different in England from those used in this country.

■ 2. By its express terms, the P & I policy, when addressing itself to the risks covered in a situation where the insured vessel causes damage to another vessel by collision, includes liability only "in so far as such liability *would* not be covered by insurance under the standard form of policy on hull, machinery, etc., issued by the American Marine Insurance Syndicate (including the four-fourths Running Down Clause)." And the P & I policy, when addressing itself to the excepted risks, uses comparable language to exclude "Claims for any loss, damage, liability, or expense which *would* be payable under an insurance under the present standard form of policy of the American Marine Insurance Syndicate on hull and machinery, etc. * * * and sufficient in amount to pay such loss, damage, liability or expense in full." There is no doubt that the use in both clauses of the auxiliary "would", which has been em-

phasized by me in copying the clauses, literally excludes from P & I protection any collision liability which *could* have been validly covered under a standard hull policy, regardless of whether the collision liability was *actually* covered by any existing hull policy. The literal meaning of the auxiliary "would" is not ambiguous. It makes the test that which by possibility could have been done. This usage of the auxiliary "would" in the apodosis of a conditional sentence is technically referred to as an example of "the auxiliary of the simple 'conditional mood'"; and it is defined by the most authoritative dictionary published in England as "expressing merely a possibility or contingency in the supposed case." The Oxford English Dictionary, vol. XII, p. 137, meaning 42. See also the illustration which the Oxford English Dictionary excerpts from Act 10 & 11 Geo. V, c. 50 § 22(1).

3. Nor is there any reason to reject a literal interpretation of the clauses. Historically, the P & I policy was designed not to duplicate coverage which could be secured under the standard form of hull policies, but rather to reach risks which were not susceptible of coverage under the older standard forms. See Arnould, Marine Insurance, 14th ed., pp. 716–718.

4. Nor is there merit to libellant's argument that a literal interpretation of these clauses has the effect of relieving the P & I insurer from liability for any collision loss, and thus of making the collision clauses surplusage,—mere meaningless words added to the contract. Under the literal interpretation of the clauses the insurer remains liable for so much of the shipowner's personal liability arising out of a collision as exceeds the maximum values which could be covered by a standard hull policy without special riders. That an excess can exist is shown later in this opinion. See Conclusions 7 and 8 below.

5. Having concluded that the P & I policy does not cover a collision liability which by possibility could have been covered by the standard form of hull policy, I now turn to consider what could have been covered by that "standard form". The problem is to be determined by looking at the printed parts of Exhibits 2 and 3. Those printed parts constitute the "standard form". We are not concerned with what alterations could be made in those printed parts by some special riders, even if such riders are used frequently or customarily.

6. Under the standard form of hull policy, the hull insurer cannot be called upon to pay more than its "proportionate part of the value of the Vessel hereby insured" and its proportionate part of the "costs" incurred in cases where liability has been contested or proceedings have been taken to limit liability. If the insured has to pay collision losses which are in excess of the value of the vessel and costs, then he would not be covered under the standard form of hull policy, and for that excess he would be coverable under the P & I policy.

7. It is not difficult to describe situations in which the collision liability of the shipowner would exceed the value of his vessel and court costs. One example is where his vessel caused another vessel damages larger than the value of the first vessel, and the collision occurred with the "privity or knowledge of" the first vessel's shipowner. In such a case the shipowner would be liable for the full damages and would not be entitled to a limitation of liability either under the Harter Act, R.S. § 4283, as amended, 46 U.S.C.A. § 183. See Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 or under general maritime law in England or the United States.

8. An example more relevant to the present case is where without the privity or knowledge of the vessel's owner, that is, in a case where limitation of liability is allowed under the Harter Act, the insured's vessel has caused another vessel damages larger than the value of the first vessel. In such a situation the shipowner is liable *in personam* up to a maximum which includes not only (1) the value of his vessel [46 U.S.C.A. § 183], but also (2) the value of her freight then

pending [46 U.S.C.A. § 183], (3) interest on the values of the vessel and the freight from the time of the collision to the time of the decree [The Wanata, 95 U.S. 600, 613, 615, 34 L.Ed. 461] and (4) taxable costs [Ibid.]. The hull insurers under a standard form of hull policy (to which no rider or special valuation clauses were attached) are not subject to any obligation with respect to the second or third of those items. See The Wanata, 95 U.S. 600, 612, 614, 34 L.Ed. 461. Therefore, the shipowner has the right to be indemnified by the P & I underwriter for payments made by him to cover the second and third items, that is, payments calculated with reference to freight or interest in advance of the decree.

9. Application of the principles just stated to the facts in this case must begin with an analysis of the actions taken by Judge Aldrich on March 10, 1958 in Admiralty 57–31. He found that (1) the Mary J. Landry was worth more than $20,000, (2) the Mary J. Landry and its freight were worth no less than $24,000, (3) B & E, Inc. (the libellant in that case) was entitled to a principal sum of $22,970 plus interest of $1,355.23 plus costs of $318.89, and (4) George H. Landry was entitled to limitation of liability. All these findings were incorporated by reference in the judgment entered by Judge Aldrich on March 10, 1958.

10. In effect Judge Aldrich decided that:

(a) Beyond any question, the first $20,000 of the amount awarded by the decree could have been collected from Landry on account of his ownership of the hull.

(b) The remaining $2,970 of principal and $1,030 of the $1,355.23 interest or a total of $4,000 could be recovered from Landry on account of his ownership of the hull and on account of his pending freight; but it is undetermined how much of the $4,000 Landry could be required to pay on account of hull alone.

(c) The remaining $325.23 interest could be recovered from Landry pursuant to the doctrine of The Wanata, 95 U.S. 600, 613, 615, 34 L.Ed. 461.

11. After Judge Aldrich entered the decree just analyzed, the hull insurers paid $20,000. With that amount this suit is not concerned. Landry himself paid the remaining $4,644.12 set forth in the decree, as well as $64.64 on account of interest subsequent to the decree and on account of costs of execution of the decree, or a total of $4,708.76. We must now consider how much of this $4,708.76 which Landry paid satisfies the two conditions of the policy that (a) the payments must be on account of collision liabilities, and (b) the liabilities must be such as would not be covered under a standard form of hull policy.

12. The burden of proving that the payments meet these two conditions rests upon Landry. The P & I policy in Rule 1 states that the claim must be one that possesses those defined characteristics. It does not merely rely on the statement in Rule 2 that the insurer will pay a collision loss, except that it will not pay one which would be covered by a standard form of hull policy. We are not here dealing with the situation where under certain conditions an insurance company has merely reserved an exception under which it may escape a liability that would otherwise exist, and must prove that the facts are within the reserved exception.

13. Landry has not shown that the $64.14 on account of interest subsequent to the decree and on account of the costs of execution of the decree was a payment made on account of collision liabilities. That payment was attributable to his personal delay in responding to his obligations as a judgment debtor.

14. However, Landry has shown that the $318.89 in taxable costs assessed in the decree was paid on account of collision liabilities. But he has not shown that such taxable costs could not have been covered as collision losses under a standard form of hull policy. The standard form of hull policy set forth in finding 7 does cover taxable costs in cases where the necessary assent of hull under-

writers has been procured. And Landry has not shown that such assent would have been withheld, or could reasonably have been withheld by hull underwriters.

15. Landry has also shown that the $2,970 principal amount set forth in Judge Aldrich's decree as well as the $1,355.23 interest set forth in that decree were collision losses. But the troublesome issue is whether he has proved that he paid the $2,970 and the $1,355.23 on account of liabilities which would not be covered under a standard form of hull policy.

16. One way by which Landry seeks to make proof is by the doctrine of estoppel. He argues that under the terms of the P & I policy in this case, the P & I insurer is bound to regard every collision loss above $20,000 which Landry paid as a loss which could not be covered by a standard hull policy. This estoppel argument begins with emphasis on the statement on page 1 of this P & I policy that the vessel Mary J. Landry is "Valued $20,000". Landry asserts that the insurance company has agreed that in computing its liabilities under Rule 1(d) the Mary J. Landry is to be valued at $20,000, hence the shipowner would be coverable by standard hull insurance only up to that amount (plus taxable costs), hence the P & I insurer assumes liability for collision loss payments in excess of $20,000 (plus taxable costs). The weakness in this argument is that the text of the P & I policy itself does not state that the $20,000 valuation is to be applied in this indirect way to the collision clause of Rule 1(d). And if the policy be thought ambiguous and parol evidence be thought admissible, there is no parol evidence upon this topic. Moreover, it is quite probable that the $20,000 valuation was inserted in accordance with usual insurance practice solely to *limit* the possible dollar amount of the risks assumed by the insurer under various clauses of the policy and thus to *reduce* the premium payable by the insured. There is no ground in the policy or the other evidence in this case for assuming that the $20,000 valuation was inserted for the additional purpose of expanding the possible dollar amount of risks assumed by the insurer under Rule 1(d) of the policy. Nor is there any ground for assuming that the insured or the insurer supposed that the lower the figure used for the valuation of the vessel, the higher would be the appropriate premium for covering the risks set forth in Rule 1(d). In short, neither Landry nor the P & I insurer relied on the $20,000 valuation as the point from which to measure the excess collision liability of the P & I insurer. The estoppel argument is, therefore, rejected.

17. The second way by which Landry seeks to prove that he paid the $2,970 and the $1,355.23 on account of liabilities which would not be covered under a standard form of hull policy requires an awareness of exactly what Judge Aldrich did decide and what he left undecided. The question presented is whether under Judge Aldrich's findings and decree, as they stood, a hull insurer under the standard policy would have been liable to reimburse Landry for the payments of $2,970 and $1,355.23 which he made pursuant to that decree. The question is *not* whether by a different handling of the suit before Judge Aldrich, Landry could have procured from him more specific findings and a more detailed decree under which further obligations and payments would have been attributable to the hull or to Landry's ownership of it.

18. In answering the question presented by the last paragraph we may assume that under a proper construction of the standard hull policy, a hull insurer agrees that (up to the financial limits of its hull policy) it will reimburse the insured for such collision loss payments made by the insured as are within the value of the hull *as that value may be determinable by a court in a proceeding wherein the insured was required to make payment to a third party which suffered loss in the collision.* Compare Restatement, Judgments § 111 Comment (b). That is, the hull insurer does not limit his contract so that he can be

called upon to reimburse the insured for only such collision loss payments as are within the value of the hull as that value may be determined in a suit by the insured against the hull insurer.

19. Even if that assumption be correct it does not come into play in the case at bar because Judge Aldrich did not make a determination of the precise value of the Mary J. Landry. He said that the vessel together with its freight was worth no less than $24,000. He left it undecided whether the hull alone was worth any fixed number of dollars more than $20,000. It is true that insofar as Judge Aldrich entered as against the vessel itself in the *in rem* proceeding a decree for the full amount of the principal and interest it might be argued that Judge Aldrich acted upon the implicit assumption that the vessel itself (apart from freight) was worth at least an amount equivalent to the whole principal and interest. But that argument would not be valid. A judge may enter a decree *in rem* for a sum larger than he believes that the property will realize, and larger than the property does in fact realize upon execution and sale.

20. Judge Aldrich not having decided that any fixed part of the $2,970 and the $1,355.23 was necessarily attributable to the hull, if Landry were to have gone to a hull underwriter under a standard policy to seek repayment of those sums, that hull underwriter would properly have refused reimbursement on the ground that Judge Aldrich's findings and decree did not show that those sums were attributable to the hull. If, then, Landry tried to secure reimbursement from the hull underwriter by offering independent evidence to show that the Mary J. Landry was in fact worth more than $20,000, Landry would not have succeeded, for, on the evidence before me, I have found that the vessel was worth only $20,000. The final result would be that Landry would learn that such payments as he had made in excess of a $20,000 value of the hull (and taxable costs) would not be recoverable under a standard hull policy.

21. It is quite beside the mark that Landry might have secured from Judge Aldrich on the evidence before him a finding that the hull was worth a precise amount more than $20,000. Landry had no covenant with either the hull underwriter or the P & I underwriter to procure from Judge Aldrich such a precise finding. Nor did he have with the P & I underwriter a covenant to follow such course of action as would throw upon the hull underwriter as much as possible of the collision loss payments. All that the P & I contract provides is that if particular collision loss liabilities are not coverable by a standard hull policy they are covered by the P & I policy. Just as the insured's personal carelessness at the time of a collision may prevent limitation of his liability and thus put the P & I underwriter in a situation where it has to pay a liability under the policy, so the insured's inadvertence at the time of a suit brought against him by a third party may put the P & I underwriter in a situation where it has to pay a liability under the policy. The very purpose of the P & I policy is to protect the insured against his suffering from his carelessness or inadvertence.

22. With respect to the items of $2,970 and the $1,355.23 in Judge Aldrich's decree we then have this situation. To use the exact language of Rule 1(d) of the P & I policy these items reflected liabilities imposed on Landry "in respect of loss of * * * any other vessel * * * caused by collision with the Mary J. Landry." Yet because on the evidence before him Judge Aldrich did not attribute these liabilities to the hull, and because on the evidence before me I cannot attribute these liabilities to the hull, they constitute liabilities which "would not be covered by insurance under the standard form of policy on hull." Having paid these liabilities, Landry has a right under the P & I contract to have the P & I underwriter make good these payments. In short Landry is entitled to recover from respondent in the case his payments of $2,970 and $1,355.23, or

a total of $4,325.23, with interest at 6% from August 27, 1958, the date which is the date when this suit was begun, and which, so far as appears from the testimony, is the first date on which demand for payment was made.

23. Landry also contends that he is entitled to be reimbursed by the P & I insurer for the loss of profits he sustained when his vessel was arrested. Landry's first theory is that the P & I insurer had a duty to post a bond to secure the release of the vessel, and that if the insurer had done this promptly his vessel would have earned substantial sums. The short answer to this theory is that the P & I insurer undertook no such duty. It never agreed either to post a bond to secure payment of, or to indemnify the policyholder against, any collision losses which were payable *by his vessel* or which were payable by the shipowner solely because they were equivalent to (or less than) the value of his vessel. Payments of (and liabilities connected with) all such *limited* losses could have been covered by the standard form of hull insurance. The P & I underwriter assumed the risk only of such collision loss payments as were in *excess* of the value of the blameworthy vessel. What happened to the vessel itself was no concern of the P & I underwriter. Therefore, the respondent owed libellant no duty to post a bond at any time to secure the release of the Mary J. Landry.

24. Landry offers another theory to show that he is entitled to recover from the P & I underwriter profits he lost from his inability to use the Mary J. Landry while it was under arrest. He contends that his loss of profits constituted one of the "expenses" which he "paid" as a result of the collision of the Mary J. Landry with the B & E. But there is no clause in the P & I policy which indemnifies the insured against loss of profits by the insured or that treats such a loss as one of the "expenses" which were "paid".

Decree for libellant for $4,325.23 together with interest at 6% from August 27, 1958 to the date of decree, and costs.