John S. PACE, Plaintiff, Appellee,

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant, Appellant.**

No. 86–2130.

United States Court of Appeals,
First Circuit.

Heard July 3, 1987.

Decided Jan. 22, 1988.

Rehearing Denied Feb. 19, 1988.

Thomas E. Clinton, with whom Seth S. Holbrook and Clinton & Muzyka, P.C., Boston, Mass., were on brief, for defendant, appellant.

Robert W. Smith, with whom Edward L. Gnys, III and Gunning, Lafazia & Gnys, Inc., Providence, R.I., were on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, and BOWNES and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

This appeal involves an insurance claim based upon the sinking on March 25, 1984, in daylight hours and calm waters, of a 72–foot wooden Rhode Island fishing vessel "PATRIOT." The plaintiff-appellee, Pace, was the boat's owner and the defendant-appellant, Insurance Company of North America ("INA"), the issuer of a commercial hull policy in effect when the loss occurred.

The sinking resulted from an incursion of water which PATRIOT's captain, James Wilbur, thought was coming from a leaking hose servicing the deck wash pump. The hose seemed to be leaking at the place where it joined a bronze thru-hull fitting equipped with a gate valve and a brass nipple. When Captain Wilbur checked the engine room bilge at 5:45 a.m., there had been no excess water, but upon returning an hour later, at around 6:45 a.m., he found a foot and a half of water. Observing the leaking hose attached to the thru-hull pipe, the captain sought to staunch the flow with rags. The floor boards were afloat, the temperature of the water close to freezing, and the vessel was rolling. At some point while trying to stop the leak the captain fell against the thru-hull pipe, which bent and then gave way entirely, resulting in an uncontrolled flow of sea water through the 1½–inch hole. The pumps could not keep pace with the rising water, and one of them, at least, stopped when the lister engine that drove it became inoperative. The crew abandoned ship on a life raft at around 8:00 a.m., and they were picked up by a neighboring fishing boat from which they continued to observe the PATRIOT until, in mid-afternoon, it sank. Although the Coast Guard offered to drop additional pumps, PATRIOT's captain refused to reboard the sinking vessel in order to attempt to save it.

PATRIOT's owner learned of his vessel's loss that same day from the Coast Guard. His claim to his insurer for payment was ultimately rejected because, according to INA, the vessel did not sink because of a peril of the sea or any other cause for recovery specified in the policy.

■ Maritime hull policies like the one in question are not "all risk" policies.[1] While in modern times they have come closer to all-risk coverage because of the "Inchmaree clause" and other supplementary provisions, *see, e.g., Tropical Marine Products v. Birmingham Fire Insurance Co.,* 247 F.2d 116 (5th Cir.), *cert. denied,* 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957), they still do not pay if the loss results not from some "peril of the sea" but from the vessel's unseaworthy condition at the commencement of the voyage, including the unseaworthiness of gear attributable to ordinary wear and tear. *E.g., Sipowicz v. Wimble,* 370 F.Supp. 442 (S.D.N.Y.1974). *See By's Chartering Service, Inc. v. Interstate Insurance Company,* 524 F.2d 1045 (1st Cir.1975) (no liability where damage due to gradual wear and tear). INA defended below chiefly on the basis that the loss was due to the inferentially corroded condition of the thru-hull fitting which had been in service for some years[2] and which was not shown ever to have been disassembled for inspection and servicing. While at trial an expert called by plaintiff theorized that the major influx of water may have been from a source completely different from the suspected leaky hose and thru-hull fitting, plaintiff mentioned no such other source in the claim he originally presented to INA.

The case was tried in the district court to a jury, jurisdiction resting on diversity of citizenship. In addition to claiming for the face amount of the hull policy, plaintiff sought additional compensation under a cause of action recently established in Rhode Island allowing an insured to recover compensatory damages, punitive damages and reasonable attorney's fees from insurers who unlawfully and in bad faith refuse to pay or settle claims.[3] The jury returned a verdict under the hull policy of $200,000. On the claim for violation of the insurer's duty to deal in good faith, the verdict was $200,000 for plaintiff-owner's economic losses, $50,000 for his emotional distress, and $75,000 for punitive damages. The district court denied INA's motions for judgment n.o.v. and for a new trial. Thereafter, plaintiff requested attorneys' fees in the sum of $67,608.50, to which defendant objected. Judgment was entered for an aggregate sum, including interest at 12 percent, of $640,249.31, plus attorneys' fees. INA's appeal followed.

Appellant INA has assigned numerous errors on appeal which we discuss in turn.

---

1. The applicable coverage of plaintiff's policy reads as follows:

Touching the adventures and perils which this Company is contented to bear and take upon itself, they are of the waters named herein, fire, lightening, explosion on shipboard or elsewhere, earthquake, assailing thieves, jettisons, barratry of the master and mariners and all other like perils that shall come to the hurt, detriment or damage of the vessel named herein.

This insurance also covers loss of or damage to the vessel named herein directly caused by:

Accidents in loading, discharging or handling cargo or in bunkering;

Accidents in going on or off, or while on drydocks, graving docks, ways, marine railways, gridirons or pontoons;

Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull (excluding the cost and expense of replacing or repairing the defective part);

Breakdown of or accidents to nuclear installations or reactors not on board the vessel named herein;

Contact with aircraft, rockets or similar missiles, or with any land conveyance;

Negligence of charterers and/or repairers, provided such charterers and/or repairers are not assured(s) hereunder;

Negligence of master, mariners, engineers or pilots;

provided such loss or damage has not resulted from want of due diligence by the Assured, the owners or managers of the vessel, or any of them.

2. PATRIOT, built in 1964 in Florida as a shrimper, was purchased in 1982 by plaintiff. It had earlier been converted by a prior owner for offshore lobstering. The thru-hull fitting in question was installed, according to plaintiff, "sometime after the vessel was brought up north and converted to a lobster boat, when I do not know." It had not since been replaced.

3. *Bibeault v. Hanover Insurance Company,* 417 A.2d 313 (R.I.1980), codified in R.I.Gen. Laws § 9–1–33 (1985) effective May 20, 1981.

1. *Denial of Directed Verdict and Judgment N.O.V. on Count I*

■ Count I was a contract claim on the hull policy written by INA on PATRIOT. The amount of the policy was $200,000 and there is no dispute that plaintiff was entitled to recover this sum as compensation for the loss of his boat if PATRIOT's demise was caused by one or more of the risks insured against, as defined in the policy. *See* note 1, *supra.*

INA asserts, however, that there was insufficient evidence to support a finding by the jury that the nature and cause of PATRIOT's loss was such as to fall within the policy coverage. The standard for this court's review of the denial of INA's motions for directed verdict and judgment n.o.v. is whether the evidence could lead reasonable men to but one conclusion, a determination made without evaluating the credibility of witnesses or the weight of the evidence at trial. *de Mars v. The Equitable Life Assurance Society*, 610 F.2d 55, 57 (1st Cir.1979) (cited in *Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 199–200 (1st Cir.1980)). As we cannot say that reasonable men and women must necessarily have accepted INA's position, we sustain the lower court's rulings allowing the jury's verdict on Count I to stand.

To be sure, the record would easily have permitted the jury to go the other way. It could plausibly have deduced that the failure of the thru-hull assembly in calm sea conditions was best explained by weakness due to ordinary wear and tear, resulting from electrolytic corrosion as testified to by INA's expert. *See Egan v. Washington General Insurance Corp.*, 240 So.2d 875 (4th Dist.Fla.App.1970) (corrosion of bolt due to electrolysis, not being a covered "latent defect," could be wear and tear and hence outside policy coverage). Both parties were hampered by the fact that, being at the bottom of the ocean, the PATRIOT and its parts were unavailable for inspection. Hence INA's theory necessarily rested on inferences drawn from such facts as that the thru-hull fitting had given way without any apparent reason to do so, suggesting an already weakened condition. INA also presented expert testimony that the combination of brass and bronze would cause electrolysis, resulting in corrosion, and pointed to evidence that the thru-hull had not been replaced for some years nor disassembled and serviced.

If the jury had been persuaded by this evidence and had found that the sinking was due to the defective and deteriorated condition of this vital part, on the effectiveness of which a vessel's water-tight integrity depends, it should have denied recovery. *See, e.g., Sipowicz v. Wimble*, 370 F.Supp. at 446–47.

However, while INA makes a good case for its theory, we cannot say that the jury had no reasonable alternative but to accept it. The plaintiff presented expert testimony to the effect that the water Captain Wilbur first observed emanated from putative damage that may have been sustained the previous afternoon at about the same time the steering shaft had suddenly parted. As a result of the parting of the shaft, the vessel could only be steered from the stern by an unwieldy emergency tiller which, the captain found, could move the rudder only with difficulty. Because of the steering problem, the captain had to stop fishing and was planning to go home the morning of the sinking. Under this theory, loose fishing gear in the water, including a "blivet" (a heavy sinker weighing over 100 pounds designed to secure the trawl to the bottom) may have become entangled in the rudder and propeller, first breaking the steering shaft (which could have been tightly held by the automatic pilot), and later ripping off an adjacent strut, thus opening up the wooden hull in that area. That the incursion of water was from a source additional to the leaking hose and thru-hull assembly was supported by evidence that, if the pumps had been functioning properly, as the captain testified they were, their purported capacity would have been more than adequate to keep up with any inflow from the 1½-inch thru-hull hole.[4]

---

**4.** Plaintiff's expert accounted for the absence of

water prior to the next morning by the fact that,

INA argues that even if a leak was started the day previous, the allegedly corroded thru-hull fitting, when it broke off, brought more water in, and so was at least a partial cause of the loss. That sufficed, INA insists, to remove the loss from coverage. We disagree. Even supposing the thru-hull was unseaworthy, its contribution to the sinking would not be dispositive if the jury found another, covered cause was the "predominant efficient cause of the loss." *Goodman v. Fireman's Fund Insurance Co.*, 600 F.2d 1040, 1042 (4th Cir.1979). More important, the jury was not bound to find that the thru-hull fitting failed because of corrosion. Testimony came in disputing defendant's expert's testimony that the gate valve thru-hull device, being made of dissimilar metals, bronze and brass, would necessarily have suffered from electrolysis. There was no direct evidence that the particular thru-hull fitting had become corroded. The captain who preceded the present one, and who had been on board PATRIOT for several years, testified to having regularly checked all the thru-hulls visually and by tapping them with a tool. Nor was there evidence that utilization of a gate valve fitting fell below industry norms or any specific requirements of INA, or that plaintiff's maintenance standards were below acceptable standards or conflicted with any specific requirements of the insurer.[5] To the contrary, plaintiff presented evidence that the boat had been well maintained. Her hull (although not the thru-hulls) had been carefully looked at recently when PATRIOT was hauled at a boatyard for repair of a leak in her planking. The boat had been surveyed twice in 1982 and was then reported to be in good condition. Based on evidence of this nature, of which there is a considerable volume in the record, we are unable to say that the jury lacked any basis to refuse to infer that the thru-hull was unseaworthy, that is, unfit for its intended purpose due to corrosion or

some other deficiency reflecting the owner's below-par maintenance, or wear and tear, when PATRIOT put to sea on March 23.

To be sure, the jury's determination might seem to fly in the face of the fact that the thru-hull pipe bent and either broke or came loose when the captain was endeavoring to staunch the leak around the hose. Common sense might suggest that a fitting of this type, if in good condition, would not pull out or break away simply because of the impact of someone bumping into it. However, there was testimony that the heavy floorboards were rolling in the accumulated water and that one of these could have hit the fitting. Moreover, the captain's recollection of what went wrong with the device was so imprecise that it is uncertain what part of it broke if, indeed, it actually did break. We cannot altogether rule out some unusual event, consistent with the owner's diligence, as the cause of the thru-hull's apparent failure. Conceivably the fitting had been negligently loosened by workmen at the yard where PATRIOT had just been hauled. Conceivably it harbored some kind of unusual and undetectable flaw. Conceivably it had been weakened by some kind of peculiar stress while the PATRIOT was at sea. The policy itself protected against negligence of repairers, masters and mariners, *see* note 1, *supra*, as well as latent defects in the machinery or hull. We think it lay within the province of the jury to determine whether or not the failure of the thru-hull was attributable to its unseaworthy condition at the commencement of the voyage.

INA contends that as the vessel sank in relatively calm waters (not glassy calm, since the boat was well offshore in March, but in ocean seas estimated at only five feet) it could not have sunk because of the "perils of the sea." The "perils of the sea" which the policy protects against, encompass

after the 6:45 a.m. inspection, the captain put the boat in gear (it had apparently been lying still all night). In the expert's view the turning over of the propellers exacerbated the damage and caused more water to enter than the pumps could handle.

5. There was evidence suggesting that a seacock would be a safer thru-hull device than a pipe and gate valve fitting but no evidence that INA refused to insure vessels with gate valve thru-hulls.

[t]he element of fortuity, a chance event or occurrence, an uncommon and unanticipated happening....

*Sipowicz,* 370 F.Supp. at 446.

■ If a boat sinks in calm seas, without more, the sinking is ordinarily presumed to have been caused, not by "a peril of the sea," but by the vessel's own inherent unseaworthiness, *i.e.,*

from the defective, deteriorated or decayed condition of the vessel or from ordinary wear and tear.

*Id.* at 448.

But we think the jury here had a sufficient basis from which to find that the sinking was due to a "peril of the sea."

As already noted, the jury could have found that a misadventure connected with the hauling of gear the previous afternoon and the breaking of the steering shaft, as projected by plaintiff's expert, caused the vessel to spring a leak, and that this was the primary cause of the loss. Such a fortuitous accident could be found to have been a peril of the sea covered by the policy.

■ The jury could also have found, from evidence earlier described, that the boat, including the thru-hull fitting, was seaworthy when it put to sea, and that the sinking was therefore due to some unknown fortuitous event. This court has held that the presumption of unseaworthiness created by a sinking in calm waters is overcome by proof that the vessel was, in fact, seaworthy. It may then be inferred that the sinking was due to "some extraordinary, although unknown and unascertainable, peril of the sea." *Boston Insurance Co. v. Dehydrating Process Co.,* 204 F.2d 441, 443 (1st Cir.1953).

For these reasons, we hold that the court correctly declined to direct a verdict for INA or to enter judgment n.o.v. on Count I.

### 2. *Error in the Instructions on Count I*

■ We find no reversible error in the court's instruction that,

if a vessel is seaworthy when the insurance policy is issued the reasonable presumption is that it continues to be seaworthy *absent evidence to the contrary,* up until the time of its loss.

(Emphasis supplied.) While the Fifth Circuit has said, in a time hull policy case, that there is "a sort of negative, modified warranty" that a vessel owner "will not knowingly permit the vessel to break ground in an unseaworthy condition," the same court made it clear in that same case that the insurer has the burden,

not only of proving unseaworthiness ... but that such unseaworthiness ... was the cause of the loss.

*Saskatchewan Government Insurance Office v. Spot Pack,* 242 F.2d 385, 388–89 (5th Cir.1957).

The district court here qualified its reference to a continuing presumption of seaworthiness by the phrase "absent evidence to the contrary." This allowed adequate scope for the insurer to seek to establish unseaworthiness. Here INA tried but failed to convince the jury of unseaworthiness. We think the instruction was sufficient.

We have also considered INA's challenge to another portion of the charge relative to the cause of sinking and unseaworthiness. We find no reversible error. *See Boston Insurance Co.,* 204 F.2d 441.

### 3. *Testimony of Plaintiff's Expert*

■ We likewise do not find that the district court abused its discretion by allowing plaintiff's expert, Gerrit Van Dissel, to testify. Among other things, he proposed the theory that the water entered because of damage to a strut resulting from the snagging of a blivet when a postulated ghost trawl line became wrapped in the propeller.

INA argues that the theory was speculative; still, it rested upon, and purported to explain, events described at trial. Captain Wilbur had testified to the breaking of the steering shaft the previous day and to occurrences before and after. He explained, among other things, that PATRIOT's crew had snagged various kinds of "ghost trawl" gear, *i.e.,* abandoned lines and

**578**

equipment left by other fishermen. He testified that all trawls have blivets. Van Dissel was also exposed to the testimony of PATRIOT's former captain, McKellips, and to other evidence concerning PATRIOT's construction and operation. A trial court has substantial discretion in determining the admissibility of expert testimony. *Coleman v. DeMinico*, 730 F.2d 42, 45 (1st Cir.1984). Defendant's expert was allowed to rebut Van Dissel's theory of how the vessel may have been damaged the previous afternoon.

Given the absence of determinative evidence concerning the cause of PATRIOT's sinking, we see no error in permitting Van Dissel to present his explanation, based on evidentiary facts, of why PATRIOT sank. It is true the evidence supporting Van Dissel's theory depended upon inference, but so was the evidence supporting INA's theory that the thru-hull fitting had failed because of electrolytic corrosion. To be sure, the plaintiff's captain, Wilbur, had identified in his reports the leaky hose and collapsed thru-hull fitting as the sole suspected source of the water entering PATRIOT. Plaintiff, indeed, when reporting the loss to INA, never suggested another source—although this has in no way prevented plaintiff's attorney from arguing that the insurer should have realized all along that another leak was implicated. One might wonder, if the alternative source was so obvious, why PATRIOT's captain and crew and subsequently her owner, so entirely missed the fact. There is, charitably, a possible answer. Captain Wilbur was a very young, inexperienced man; he had never been a fishing boat captain until several days before the sinking. He apparently did not even attempt to close the gate valve. It remains, moreover, a mystery how the collapse of the thru-hull could have sunk

the vessel if all the pumps were working, as Wilbur said they were. In any event, given a situation where the questions far exceed the available facts, we cannot say that the district court committed error in allowing the jury to hear an opinion that the principal incursion of water was from a source other than the leaky hose and thru-hull fitting. The breaking of the steering shaft the previous afternoon, at a time when there was loose gear in the water, was an occurrence that could plausibly suggest a possible freak accident with wider ramifications than were then realized by the crew. We do not think that Van Dissel's expert testimony, arguing for this alternative source of damage to PATRIOT, was beyond the court's authority to permit in a case where, to this day, the cause of the sinking remains obscure.

**4. *Count II—Bad Faith and Punitive Damages***

We turn now to appellant's more troublesome argument that there was insufficient evidence to support the jury's verdict under Count II. This resulted in an award of $200,000 for economic losses, $50,000 for emotional distress, and $75,000 for punitive damages. Additionally, the court later allowed plaintiff's request for an award of attorneys' fees.

Count II—unlike Count I which was a maritime contract claim based on the terms of the insurance agreement between the parties—rested on a cause of action in tort initially established in 1980 by the Rhode Island Supreme Court in the case of *Bibeault v. Hanover Insurance Co.*, 417 A.2d 313 (R.I.1980), and a year later codified by the Rhode Island legislature as R.I. Gen. Laws § 9–1–33 (1981).[6] The new cause re-

6. R.I.Gen. Laws § 9–1–33, effective in 1981, provides as follows:

**9–1–33. Insurer's bad faith refusal to pay a claim made under any insurance policy.—** (a) Notwithstanding any law to the contrary, an insured under any insurance policy as set out in the general laws or otherwise may bring an action against the insurer issuing said policy, when it is alleged said insurer wrongfully and in bad faith refused to pay or settle a claim made pursuant to the provisions

of said policy, or otherwise wrongfully and in bad faith refused to timely perform its obligations under said contract of insurance. In any action brought pursuant to this section, an insured may also make claim for compensatory damages, punitive damages and reasonable attorney fees. In all cases in which there has been no trial in the Superior Court on or before May 20, 1981, the question of whether or not an insurer has acted in bad

quires proof of an insurer's *bad faith* refusal to deliver payments due under a contract of insurance. *Bibeault,* 417 A.2d at 317–18. It is designed to redress the imbalance in bargaining power between an assured and the insurer, an imbalance which may lead the insurer to stonewall, or "to find the loophole," in order to reduce or totally eliminate its just liability. The Rhode Island court stated,

> The duty of an insurer to deal fairly and in good faith with an insured is implied by law. Since violation of this duty sounds in contract as well as in tort, the insured may obtain consequential damages for economic loss and emotional distress and, when appropriate, punitive damages. *Christian v. American Home Assurance Co.,* 577 P.2d 899 (Okla.1977). In regard to punitive damages, we would point out that the intent necessary to establish the tort of bad faith is not equivalent to the intent that would sustain an award for punitive damages. Punitive damages may only be awarded when an insurer has acted with malice, wantonness, or wilfulness....

417 A.2d at 319.

■ INA makes a threshold contention, albeit briefly and with little elaboration, that a state claim like this cannot lie against the insurer of a maritime risk. A policy of marine insurance is a maritime contract governed by the admiralty clause of the Constitution. *Wilburn Boat Co. v. Fireman's Fund Insurance Co.,* 348 U.S. 310, 313, 75 S.Ct. 368, 370, 99 L.Ed. 337 (1955). Can a *state* law be given effect which penalizes the writer of such a policy for its bad faith refusal to pay a claim?

Our somewhat tentative answer is "yes." The jurisdiction of the district court in this case rests upon diversity of citizenship under 28 U.S.C. § 1332 (1982), not upon the court's exclusive admiralty and maritime jurisdiction under section 1333. Thus the district court unquestionably had jurisdiction of the state claim. The question re-

mains, however, whether a Rhode Island cause of action like this can permissibly supplement a contract claim in admiralty on a marine insurance policy.

In *Wilburn Boat Co. v. Fireman's Fund Insurance Co.,* the Supreme Court said that "it does not follow ... that every term in every maritime contract can only be controlled by some federally defined admiralty rule." 348 U.S. at 313, 75 S.Ct. at 370. Indicating that "in the field of maritime contracts as in that of maritime torts," the national government has left much regulatory power in the states, the Court stated that state regulatory power is "particularly broad in relation to insurance companies and the contracts they make." *Id.* at 314, 316–21, 75 S.Ct. at 370, 371–75.

No admiralty rule or precedent conflicting with the Rhode Island action against an insurer for its bad faith refusal to pay claims has been called to our attention. We do not view the Supreme Court's decision in *Insurance Co. v. Piaggio,* 83 U.S. (16 Wall.) 378, 21 L.Ed. 358 (1872), as such a precedent. While the Court there ruled that the plaintiff could not "recover special damages for the detention of money due to him beyond what the law allows as interest," *id.* at 386, this was little more than a restatement of customary contract law principles. The Court was not considering a tort for an insurer's bad faith refusal to pay. Nor has appellant pointed to specific federal maritime policies that make it important for federal courts to establish their own rule in this area and not to give way to separate state rules. Unless and until apprised in some future case of convincing reasons to the contrary, we believe this Rhode Island cause of action can coexist with federal admiralty law under the *Wilburn Boat* formulation. *Compare, e.g., Steelmet, Inc. v. Caribe Towing Corp.,* 779 F.2d 1485, 1490–91 (11th Cir.1986) (state law direct actions may be brought against a marine insurer even though no provision for them exists in federal maritime law). Construction and enforcement of the ma-

faith in refusing to settle a claim shall be a question to be determined by the trier of fact.

(b) The provisions of this section shall apply to all actions against insurers which have

been commenced and are pending in any state or federal court on May 20, 1981.

rine insurance contract itself will, of course, remain based in all cases upon uniform federal law. And there can be no recovery under the Rhode Island law unless plaintiff prevails on his admiralty contract claim. Similar state causes of action have been entertained, although apparently without questions having been raised, in at least two other circuits. *Kilpatrick Marine Piling v. Fireman's Fund Insurance Co.*, 795 F.2d 940, 945–47 (11th Cir.1986); *Bohemia, Inc. v. Home Insurance Co.*, 725 F.2d 506, 511 (9th Cir.1984). Thus we reject INA's assertion that it cannot be held liable under the Rhode Island law covering insurers' bad faith refusals to settle or pay claims.

We turn next to INA's most potent argument—namely that the jury was without a sufficient legal and evidentiary basis to determine that INA's refusal to pay this claim was wrongful and in bad faith within the meaning of the Rhode Island law. INA moved for a directed verdict and for judgment n.o.v. on Count II, as it did on Count I. Such a motion raises the question, already noted in respect to Count I, as to whether a reasonable jury could have come to only one conclusion on the evidence presented. If so, a jury verdict reflecting another conclusion is erroneous as a matter of law. It is true that R.I.Gen. Laws § 9–1–33 expressly makes "the question of whether or not an insurer has acted in bad faith in refusing to settle a claim ... a question to be determined *by the trier of fact.*" (Emphasis supplied.) This court has held, however, that the emphasized language does not, and cannot, empower a federal jury to exceed its normal power and function; the same standard governs judgment n.o.v. motions in a case under section 9–1–33 as in any other case. *Cowdell v. Cambridge Mutual Insurance Co.*, 808 F.2d 160 (1st Cir.1986).

The question is thus whether a reasonable jury could, on this record, determine that INA's refusal to pay was wrongful and in bad faith. R.I.Gen. Laws § 9–1–33. *See* note 6, *supra*. In *Bibeault v. Hanover Insurance Co.*, the Supreme Court of Rhode Island, after announcing the new, independent claim in tort based on "a spe-cific finding that the insurer has in bad faith refused to pay the claims due an insured," stated,

> Recognition of this tort in Rhode Island does not, however, imply that whenever an insurance company loses a dispute in court regarding the validity of a claim, it breaches the implied-in-law duty of good faith. If a claim is "fairly debatable," no liability in tort will arise. We quote with approval the test established by the Supreme Court of Wisconsin:
>
> > "To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. It is apparent, then, that the tort of bad faith is an intentional one. * * * [I]mplicit in that test is our conclusion that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless indifference to facts or to proofs submitted by the insured." *Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 691, 693, 271 N.W.2d 368, 376–77 (1978).

417 A.2d at 319. Very recently the Supreme Court of Rhode Island reiterated that recognition of this tort does not mean that "whenever a company loses a dispute in court regarding the validity of a claim it breaches its duty." *Calenda v. Allstate Insurance Co.*, 518 A.2d 624, 628 (R.I. 1986).

INA argues that the jury could not, on the present record, reach any conclusion other than that there existed a reasonable, good faith basis for the insurer to deny benefits. Even conceding, as we have held, that there was sufficient evidence to support the jury's finding of coverage under the policy, INA insists that the sinking of PATRIOT in a calm sea—without the occurrence of any known fire, explosion, storm or other recognized "peril of the sea," and under circumstances from which it could reasonably be inferred that a corroded thru-hull was the likely cause of the loss—made plaintiff's claim "fairly debata-

ble" at least. The policy, as already noted, was not an all-risk policy.

■ Plaintiff's responses are twofold. First, plaintiff insists that "there is absolutely no evidence" that the thru-hull failed because of corrosion, and that INA, in any case, should have recognized that the sinking was due to something besides the thru-hull, *e.g.*, was likely due to damage caused by a purported "blivet" the previous day. Second, plaintiff points to evidence that INA's own investigation of the claim was inadequate and marred by the improper receipt of false information. Thus INA's bad faith should be inferred from the inadequacy of its investigation, so plaintiff contends. We discuss the two points in turn.

We disagree with plaintiff's first point. While, as we have stated, *supra*, it was within the jury's province to reject INA's position that the loss was caused by an unseaworthy thru-hull fitting, this does not mean that INA was guilty of bad faith in raising it. "When a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law." *Anderson*, 271 N.W.2d at 376. The mere fact a court or jury ultimately rejects the insurer's reason for denial does not demonstrate a breach of the insurer's duty to exercise good faith. *Bibeault*, 417 A.2d at 319; *Calenda*, 518 A.2d at 628. We do not believe that INA's position was less than "fairly debatable." *Bibeault*, 417 A.2d at 319.

Plaintiff would have us ignore that it was plaintiff himself, not INA, who stated that the deck-wash thru-hull fitting was the suspected source of entry of the water. In his insurance protest form filed on March 28, 1984, three days after the loss, Pace wrote down as the "cause of loss,"

> Uncontrollable leakage in the area of the thru-hull fitting for washdown pump.

Captain Wilbur, in his statement of March 30, 1984, reported his "problem ... was around the Deck wash.... I found the

pipe to the deck wash leaking around the hose and tried to rap [sic] rags around it when I leaned against it. It then broke off and the water began to rush in."

Given this report from the man who was in charge of PATRIOT when it sank, we do not see how it can be said that INA was unreasonable to ascribe the loss to the thru-hull pipe. Nor do we think it was unreasonable for INA to have inferred that the most likely explanation for the breaking off of a fitting of this nature, when the captain leaned against it, was that it had become weakened over time by some form of unattended deterioration. There was no evidence the thru-hull had ever been replaced, disassembled, or serviced. The owner of the boatyard where PATRIOT had just been hauled denied having checked the thru-hulls. The evidence most favorable to plaintiff on this score was from the previous captain who said he had visually checked the thru-hulls and tapped them.[7] INA's expert—the only metallurgist to testify—opined that the combination of bronze and brass, of which PATRIOT's fitting was made, would cause electrolysis resulting in corrosion. He discounted the usefulness of the zincs placed elsewhere on PATRIOT's hull in combatting electrolysis of this thru-hull, and testified that corrosion would not be revealed by tapping the thru-hull or merely looking at it. (There is case law that corrosion due to electrolysis is not a covered "latent defect." *Egan*, 240 So.2d 875.) INA also presented expert evidence suggesting that the period of time which it took for PATRIOT to sink was consistent with the amount of water that would have entered the 1½-inch thru-hull hole. Much of this evidence, to be sure, was vigorously disputed by other experts. We say only that we can see no basis for determining that INA's theory, premised on PATRIOT's captain's report indicating that the water was from the thru-hull, was so analytically weak as not to be "fairly debatable."

---

7. While this witness testified that the thru-hulls were not corroded, he conceded that he had not taken them apart and could not know their condition inside. INA's witness disputed that the checks made by the captain were sufficient to have revealed whether the fittings were corroded. PATRIOT's owner and Captain Wilbur both acknowledged not having checked the thru-hulls.

The jury, as was its right and duty, decided which version to accept, finding against INA on the claim under the policy; but even after a hard-fought trial, the record of which we have read with interest and care, no certain impression emerges of what caused the sinking. INA's theory, while bruised in combat, is no more plainly flawed than any other; a reasonable person could accept it, notwithstanding its defects, as still, on balance, the most likely explanation. We recognize plaintiff's argument that if a vessel is proven seaworthy, its sinking for obscure reasons may be presumed to have been caused by some unknown "peril of the sea," hence covered by an insurance policy of this nature. But while there was evidence of PATRIOT's seaworthiness in general, we cannot say there was compelling evidence that the suspected thru-hull fitting was seaworthy. Rather, we think, its condition was "fairly debatable." We therefore reject plaintiff's argument that this reason for INA's refusing to pay the claim was not a "fairly debatable" one.

■ Plaintiff has a second rejoinder, based on the inadequacy of INA's investigation of the claim. Plaintiff points to evidence that INA's investigation of the claim was, in certain respects, slipshod to the point of being biased and unfair. He argues that the jury could properly find from this evidence alone that INA had wrongfully and in bad faith refused to pay or settle the claim.

In the *Anderson* case from Wisconsin, to which the Rhode Island court in *Bibeault* referred with approval, the court said,

It is appropriate, in applying the test, to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review. In the instant case, insofar as the complaint alleges, the insurer and the other defendants refused even to consider the nature and extent of the plaintiffs' damages, and specifically rejected and spurned the opportunity to evaluate and consider the submitted proof of loss.

271 N.W.2d at 377. The *Anderson* court also referred approvingly to an earlier Wisconsin decision emphasizing an insurer's duty to "assess claims as a result of an appropriate and careful investigation and that its conclusions should be the result of the weighing of probabilities in a fair and honest way." *Id.* at 375. In that case, an insurer's failure to make an honest, careful evaluation of a claim against its insured had caused the insured to suffer a judgment in excess of the policy.

In the present case, Pace submitted the owner's protest form on March 28, 1984, three days after PATRIOT sank, attributing the loss to "an uncontrollable leakage in the area of the thru-hull fitting." Meanwhile, INA had engaged Richard F. Learned, President of Learned Associates, Inc., Marine Surveyors, North Kingstown, Rhode Island, to investigate the loss. Learned submitted a report dated April 12, 1984, rendering an opinion that "the vessel did sink due to water entering the vessel through a saltwater intake located in the vessel's engine room." Learned further opined that the loss was caused by a deteriorated pipe attaching to a thru-hull fitting rather than an external cause. He said he considered the vessel to have been unseaworthy at the time of the incident. Learned supported this view on the basis that there was no evidence of "any external cause or triggering incident" and that "the initial incident was leakage through the piping attaching to the through-hull fitting or at the attachment joint; and that through hand pressure alone [sic] this pipe was disconnected from the through-hull fitting." Learned said: "In my opinion this would indicate a gradual deterioration situation of the pipe or through-hull fitting. I would also consider this to be a condition negatively affecting the vessel's seaworthiness." Learned also criticized the design of the fitting (with the shutoff positioned out on the pipe rather than immediately at the thru-hull fitting), and commented on confusion by crew members as to what pumps existed and were operating. Attached to his report were statements from owner Pace, Captain Wilbur, two crewmen, and a newspaper account of the sinking.

Later, in June, Learned apparently gathered certain receipts and records from the boatyard where PATRIOT had been maintained. He did not, however, try to determine the boat's condition prior to the sinking by speaking to people there who had first hand knowledge of the boat.

A memo from William McTott, INA's hull/manager, to Edward Brink, its Supervisor of Boston Marine Claims, was placed in INA's investigatory file on April 4, 1984. The memo stated that one Frank Ostrow from Trend Insurance, Inc., had reported knowledge "of excess of five possible sinkings" of the PATRIOT in the past six months. This purported information as to five previous sinking turns out to be an old wives' tale. Ostrow denied at trial ever having provided it. Whether or not he did, the story was never checked out and corrected. Instead, it apparently circulated with the file, casting an unjustified pall of unreliability over the claim.

INA's Superintendent of Marine Claims, Jack Rush, wrote his own memo to Brink on April 4, 1984, criticizing the poor quality of the investigation to date. The most serious of these criticisms was that "Mr. Learned's opinions of unseaworthiness are at best educated guesses. We have no specifics of any condition surveys." Rush also stated, "No reasoned opinion from you to support your recommendation of a denial, and no proposed disclaimer." Rush concluded there was "no justification for denial at this point," but "much more information is needed before settlement would be in order." Rush said that, whatever Brink's decision may be, "the case should be directed to counsel."

■ Further correspondence occurred, with Rush urging his underlings to obtain witnessed statements and do a more thorough investigation. Finally in the summer, INA's counsel, Leo F. Glynn, interviewed PATRIOT's owner, Pace, and Captain Wilbur. The results of these interviews appear in letters which, although marked for identification and offered in evidence by INA, were refused by the district court as hearsay.[8]

We think the evidence before the jury, insofar as it went, would have supported a finding that INA failed to carry out an adequate, proper inquiry into the circumstances of the sinking. Whether the jury could have reached an accurate assessment of INA's good faith without being allowed to see Attorney Glynn's letters, indicating his reasons and recommendations for denying the loss, is, however, a close question. While the August 15 letter reflects some reliance upon the McTott hearsay concerning previous purported groundings, its main basis for disputing the claim appears to be doubt as to the seaworthiness of the thru-hull, a reasonable issue for concern. However, we need not determine the effect of the court's error in excluding the letters. Even if the error were harmless, and the investigation was flawed, we hold that plaintiff cannot prevail in his tort claim against INA.

---

8. It was error to exclude the letters. They were offered not for their truth but to prove that INA had refused the claim on counsel's advice and not in bad faith. Fed.R.Evid. 801(c). *See Staniewicz v. Beecham, Inc.,* 687 F.2d 526, 530-31 (1st Cir.1982); Weinstein, *Evidence* p 801(c) [01] (1987). Given the importance of the kind of investigation INA pursued, and its basis for refusing to pay the claim, these letters were highly relevant. Among other things, Attorney Glynn (who was deceased by the time of trial), concluded in the final letter dated August 15, that the

maintenance of the pipe which was connected to the fitting was at least inferentially substandard, since it produced a major leak in ordinary use. A through-hull opening is a sensitive area since the vessel's survival is at risk. The captain ... had never paid any

particular attention to the pipe or the fitting before that time and was unable to describe its prior condition. The fact that the fitting failed under ordinary circumstances and permitted so much water to enter so quickly in the first instance, and that the pipe then came away and permitted the water to enter in a more forceful manner, points to the owner's failure to maintain the fitting, the pipe and the vessel in a reasonable condition and not to a covered peril.

The attorney's letter also reflects that his misgivings were strengthened by the reference in the McTott communication to the fictional previous groundings. Further inquiry into this and related factors was directed, but a definite decision not to pay appears to have been made at this time by counsel.

Although an insurer's subjective bad faith may be inferred from a flawed investigation, an improper investigation, standing alone, is not a sufficient cause for recovery if the insurer in fact had an objectively reasonable basis to deny the claim.

In *Bibeault*, the Rhode Island court said flatly, "If a claim is 'fairly debatable,' no liability in tort will arise." It then proceeded to quote with approval the following formulation from *Anderson*"

> To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy *and* the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.

271 N.W.2d at 376 (emphasis added). Thus both an *objective* and a *subjective* component are required: 1) the absence of an objectively reasonable basis to deny, and 2) the insurer's subjective knowledge or its reckless disregard of the absence of such basis. The subjective component is essential, as the Wisconsin court states, to prove intentionality: " 'Bad faith' by definition cannot be unintentional." *Id.* Bad faith can be inferred, however, from a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proof submitted by the insured. *Id.* at 377.

But while the subjective element can be inferred from an investigation that recklessly disregards the facts, the objective element must also be shown. This requires establishing that a reasonable insurer, proceeding under the facts and circumstances that a proper investigation would have revealed would not have denied payment of the claim. *See James v. Aetna Life and Casualty Co.*, 326 N.W.2d 114, 117 (Wis.Ct. App.1982).

That the objective element is an essential aspects of plaintiff's proof is clear from the *Anderson* court's following terse summation, after discussion of the above principles:

Under these tests of the tort of bad faith, an insurance company, however, may challenge claims which are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim *without a reasonable basis.*

We are satisfied that the application of the test formulated above, which recognizes the intentional nature of the tort of bad faith *and puts the test upon an objective basis*, will minimize the fears expressed by the defendant insurance company that to permit claims for bad faith will result in extortionate law suits. *Id.* (emphasis added).

To remove the objective component of the test—to permit recovery against an insurer because of flaws in the investigation even though the insurer has, in fact, an objectively reasonable basis for denying coverage—would be to remove most of the protection for insurers and premium payers announced in *Anderson*, since it is almost impossible to conduct an investigation as to which some question of its adequacy, sufficient to get to the jury, cannot, in hindsight, be raised. Thus if there is an objectively reasonable basis to deny coverage, existence of investigative flaws, standing alone, are not enough to permit recovery in tort against an insurer under the Rhode Island statute and case law.[9]

We conclude that as the claim was "fairly debatable," presenting an objectively reasonable basis to deny coverage, no liability in tort could arise against INA. Accordingly we reverse the judgment upholding all liability of INA to plaintiff under Count II pursuant to Rhode Island tort law.

*Affirmed as to Count I, and otherwise reversed.*

## MEMORANDUM AND ORDER

Appellee has filed a petition for rehearing in this case challenging the part of our

---

9. In the recent Rhode Island case of *Calenda v. Allstate Insurance Co.*, 518 A.2d 624, 629 (R.I. 1986), the Supreme Court of Rhode Island went so far as to say, "[s]ince the evidence gives rise to a valid question of coverage, it follows that [the defendant] could not have acted in bad faith."

 

judgment reversing the jury on the bad faith count. We deny the petition.

Petitioner argues that since the district court had refused to admit the Learned report in evidence and INA did not claim error on appeal this court erred in considering it. Technically Pace may be right. However, there was no harm done to him. We mentioned the Learned report only in the part of our opinion that addressed Pace's argument that INA's investigation had been unfair and inadequate—not in our discussion of whether the claim was "fairly debatable." Pace is entirely wrong in his assumption that the report affected our determination of debatability. Our reasons for believing the cause of the loss was "fairly debatable" are set out extensively in the opinion; Pace's reargument of his position to the contrary leads us to no different conclusion.

The only reference made in the opinion to the report was with regard to the allegation that INA did not conduct a proper investigation. Learned's report, like INA's counsel's reports, was obviously relevant to INA's diligence and good faith in investigating the loss. It is hard to see how a jury could determine the adequacy and good faith of an insurer's investigation without this material. We concede, however, that unlike the question of the attorneys' reports, INA's counsel apparently did not preserve the issue on appeal. Our misplaced reference to Learned's report, however, did no harm to Pace. Learned's report was evidence arguably supporting the insurer's contention that it conducted an adequate, good faith investigation. However, in this court's opinion, we concluded, "We think the evidence before the jury, insofar as it went, would have supported a finding that INA *failed* to carry out an adequate, proper inquiry into the circumstances of the sinking." *Supra* at 583 (emphasis supplied). Notwithstanding, we ruled, as a matter of law, that "an improper investigation, standing alone, is not a sufficient cause for recovery if the insurer in fact had an objectively reasonable basis to deny the claim." *Supra* at 584.

Learned's report, in brief, was mentioned *only* to present a clearer picture of INA's investigation. It had no effect on our two basic conclusions: that the claim was fairly debatable, and that an insufficient investigation, standing alone, is insufficient to establish bad faith.

*The petition for rehearing is denied.*