Alexander J. SIPOWICZ, Plaintiff,

v.

L. R. WIMBLE and all other Underwriters at Lloyd's and Cornhill Insurance Company Ltd. and all other insurance companies, London, England, insuring the Yacht Green Lion under Policy No. T 42471, Defendants.

No. 71 Civ. 4251 JMC.

United States District Court,
S. D. New York.

Jan. 28, 1974.

---

5.  *See* Meyers v. United States, 446 F.2d 37, 38 (2d Cir. 1971).

Peter W. Carlson, New York City (Kenneth H. Volk, Burlingham, Underwood & Lord, New York City, of counsel), for plaintiff.

Brendan J. Connolly, New York City (Mendes & Mount, New York City, of counsel), for defendants.

CANNELLA, District Judge.

## OPINION

The instant admiralty and maritime claim was commenced in September 1971 by the plaintiff, Alexander J. Sipowicz, against the defendant insurers to recover $20,000 arising out of the sinking of the yacht GREEN LION on May 14, 1970. Plaintiff asserts that the loss resulted from a peril insured against by the terms of the time hull policies issued by the defendants and that, therefore, he is entitled to recover damages. Defendants take the position that the sinking was of a nature not embraced by the provisions of the policies and, therefore, that they are not liable to plaintiff herein. The case was tried before this court, without a jury, on November 2 and 14, 1973. At trial, three witnesses were called and gave testimony and certain additional documentary evidence was received. For the reasons set forth below, the court finds for the defendant insurers and grants their motion for judgment dismissing the complaint, with prejudice.

## THE FACTS

The GREEN LION, a wooden auxiliary cutter (sloop) of some 50 feet in length, built in the Netherlands in 1943, was purchased by plaintiff from a Mr. Paul Gabel in the spring of 1966. At the time of purchase plaintiff sought to insure the vessel with Lloyd's New York broker, Mr. Gilbert Fonda. In order that the insurance issue, plaintiff caused a condition survey of the yacht to be made. The survey was conducted on April 17, 1966, by the Salvage Association of London and a survey report, No. 22539, was subsequently issued. That report listed 41 specific recommendations for repairs to be made on the vessel. Among the items listed was the repair or reconditioning of certain deteriorated, missing or broken metal fastenings and frames. At trial, plaintiff testified that all work recommended by this survey was performed in 1966, either by the Tri-Boro Shipyard or by the plaintiff, his friends and his family. Thereafter, on June 24, 1966, defendants issued to plaintiff two time hull insurance policies for the GREEN LION, which policies were made subject to the terms and conditions of the American Yacht Form and which insured the vessel against named perils only. The policies were valued at $15,000 [1] and were re-

---

[1]. The stated value of the vessel was $15,000; the underwriters at Lloyd's insured 68.5102% of this amount and the British Companies insured the remaining 31.4898%. This form of co-insurance is customary among British marine insurers.

newed annually by plaintiff, the last renewal, Cover Note No. T.42471, being in full force and effect at the time of the instant loss.

The GREEN LION was launched in June 1966, several days prior to June 24th, and was sailed without incident during that entire summer. At the close of the 1966 sailing season the vessel was towed to the Little Ferry Marina, located on the Hackensack River in New Jersey, where it was hauled and laid-up ashore on a crib (dry docked).

From the fall of 1966 until May of 1970 the yacht remained ashore, on the crib, for reasons not here relevant. Prior to re-launching the boat in 1970 plaintiff, his family and friends, performed certain work on the GREEN LION's hull. These efforts included scraping off the old paint and repainting the hull, caulking the hull, and replacing planks where such re-planking was indicated.

On May 3, 1970, the vessel was taken to the launching slip at the Little Ferry Marina and placed upon a travel lift for launching. After the boat was placed in the water, a leak developed along the bottom seam of the hull next to the keel. In order that this leak might be observed, the yacht was allowed to remain on the slings of the travel lift overnight. On May 4, the GREEN LION was hauled and the vessel's leaking seam was cleaned and re-caulked. The vessel was then re-launched and moved to a dock 100 feet from the launch slip, where it remained until May 9. On May 9 the yacht was moved, under its own power, to a mooring two and one-half miles away, where it remained until May 13. Between May 4 and May 13 it was observed that the vessel was continuously leaking at various points along the bottom seam. Plaintiff testified that such leaking was a normal condition of a wooden boat until the seams swelled to a sufficient degree. Plaintiff did, however, attempt to plug this leak with cotton during the three days the boat was at the mooring.

On May 13, the leak not having subsided, plaintiff returned the GREEN LION to the Marina so that she could again be hauled and the hull investigated in order that the cause of the leak might be determined. Plaintiff testified that upon returning the vessel to dock at the Marina on the night of the 13th, he secured her, checked the bilge pump, (the pump had controlled the water entering the hull throughout this period) and closed her for the night. On the afternoon of May 14 it was discovered that the GREEN LION had sunk at her berth.

Following the loss of the vessel plaintiff obtained several salvage bids and ultimately the Little Ferry Marina was retained to raise the boat. A diver was sent down by the salvager in order to ascertain the vessel's condition and to close all her openings. On May 22 three pumps were attached to the boat and she rose 18 inches in the water. The vessel then stopped rising when water began to enter her in the keel area. The salvage operations ceased and subsequently, with a sudden movement, the GREEN LION's keel and keelson broke away from the hull. Ultimately, the salvager succeeded in raising the yacht, minus keel, keelson and the two lower planks on each side of the hull, and in laying her up on shore.

It is evident, indeed not disputed, that the GREEN LION sank due to the incursion and accumulation of water in her hull during clear weather and upon calm seas. In dispute is the cause of this condition. Plaintiff contends that the cause of the sinking is unknown and that the vessel's demise was the product of an unforeseen and unforeseeable accident to an otherwise seaworthy vessel. The defendants assert that the GREEN LION sank because of her inherently defective and unfit condition. In support of this position the insurers introduced the expert testimony of Mr. Nicholas Ryder.

Mr. Ryder, a marine surveyer with over 45 years of experience, was re-

tained by defendants to survey the vessel and he first observed the vessel when it was submerged, on May 15. He later surveyed the vessel on May 25, after it was laid up on shore. Mr. Ryder testified that his expert opinion was that the sinking of the yacht was caused by a separation of the keel and keelson from the rest of the hull and that this separation was of such a degree as to allow the incursion of water in a quantity sufficient to cause the boat to submerge. He attributed this separation to the vessel's metal fastenings which secured the keel and keelson to the hull and which had, in his opinion, deteriorated from their original thickness of ⅜ of an inch to ⅟₁₆ of an inch, or to "the point of no return."[2] Mr. Ryder further stated that plaintiff's attempt to plug the leak from the inside of the hull only served to further pry the keel and keelson from the vessel. He stated that the keel and keelson had broken away from the hull during the attempt to raise the GREEN LION because the deteriorated fastenings were not capable of supporting the 7 ton lead keel and that they were sheared off under its weight. He concluded that the keel's dropping off was inevitable because a 7 ton keel could not e supported by fastenings in so deteriorated a state.

Mr. Ryder based his opinion upon a visual inspection of approximately 50 percent of the fastenings involved; those that remained after the vessel was raised. He found that they had not been repaired, replaced or restored in compliance with the 1966 survey. He observed no new bolts, no new steel for the assisting frames and discoloration in the areas he inspected, (in short, no new work). Plaintiff, on the other hand, had previously testified that he had scraped the angle iron frames down to the bare metal, checked the bolts and fasteners, changed the fastenings wher-

ever necessary, and painted the frames with red lead anticorrosive paint. Other than plaintiff's own statement, no evidence was introduced to rebut Mr. Ryder's testimony.[3]

After a careful review of the testimony and exhibits in this case, the court finds that plaintiff insured's yacht, the GREEN LION, sank on May 14, 1970, at its dock at the Little Ferry Marina, in clear weather and upon calm seas, and that the sinking was caused by the incursion and accumulation of water in her hull. The court further finds that the incursion and accumulation of water in the hull resulted from a separation between the keel and keelson and the remainder of the hull, which separation was the direct and proximate consequence of the deteriorated condition of the fastenings and frames which secured the keel and keelson to the rest of the hull. The court finds that these metal fastenings, which were originally ⅜ of an inch in thickness when the vessel was constructed and which had deteriorated to a thickness of ⅟₁₆ of an inch at the time of the loss, were not capable, either alone or in conjunction with the other parts of the vessel, of supporting a 7 ton lead keel and that the separation of the keel and keelson from the rest of the hull was an inevitable consequence of this condition.

## THE APPLICABLE LAW

Plaintiff, in order to recover damages herein, must demonstrate that the loss which he has sustained is encompassed within the purview of one or more of the perils insured against by the defendants. To this end plaintiff here asserts that the sinking of the GREEN LION resulted from either a "peril of the sea" or a latent defect, and that, therefore, his losses are recoverable either under the "Perils" or the "Inchmaree" clause or both such clauses of the instant poli-

---

2. Plaintiff's Exhibit 15 is a schematic diagram of the keel, keelson and hull areas here involved.

3. Plaintiff's rebuttal witness, Gilbert Fonda (the insurance broker who had placed the instant policies for plaintiff), failed to qualify as an expert on the issues raised herein and was otherwise without knowledge of the vessel's physical condition.

cies. Such clauses, as contained in the defendants' policies, are standard in form and are set out in the margin.[4] On the facts of this case and for the reasons stated below, it is the opinion of this court that the sinking of the GREEN LION did not result from an insured peril and that, therefore, plaintiff can not have a recovery herein.

## Peril of the Sea

The phrase "peril of the sea" is a term of art, the precise meaning of which has been developed by several centuries of judicial construction, both in this country and in England (in whose precedents this court may find guidance). *See generally,* 11 Couch on Insurance, § 43.86 et seq. (2 ed. Anderson, 1963); 2 Arnould, Marine Insurance (15 ed.) § 800 et seq.; Ivamy, Marine Insurance, pp. 149 et seq. (1969); Buglass, Marine Insurance and General Average in the United States, pp. 27–30 (1973); 5 A Appleman, Insurance Law and Practice, § 3267 (1970). The earliest American cases defined the term "peril of the sea" to embrace only extraordinary occurrences owing to the action of the sea. Hazard v. New England Mar. Ins. Co., 33 U.S. (8 Pet.) 557, 8 L. Ed. 1043 (1834). Subsequent cases distinguished between losses which arose from injury to the vessel from without (a sea peril) and losses which resulted from a weakness within the vessel itself (decay, deterioration, wear and tear), (an uninsured event). Merchants Trading Co. v. Universal Mar. Ins. Co., 2

Asp. 431 (1870); Anderson v. Morice, 2 Asp. 424 (1874). *See also,* Compania T. Centro-America v. Alliance Assur. Co., 50 F.Supp. 986, 991 (S.D.N.Y. 1943); Ivamy, *supra,* at 149; 11 Couch, *supra,* § 43:112. The modern trend of authority and the approach adopted by the Court of Appeals for this circuit holds that it is sufficient, for purposes of recovery against an insurer under the "Perils" clause, that the damage to the vessel be done, by the fortuitous action of the sea. New York, N.H. & H. R.R. v. Gray, 240 F.2d 460, 464 (2 Cir.), cert. denied, 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957). *See also,* Spooner v. Connecticut Fire Ins. Co., 314 F.2d 753 (2 Cir.), cert. denied, 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963); Compania T. Centro-America v. Alliance Assur. Co., *supra,* 50 F.Supp. at 990–991; Ivamy, *supra,* pp. 149 et seq. (discussing the English precedents); Buglass, *supra,* pp. 28–30; 11 Couch, *supra,* § 43.-98; Vogel, The Hull Policy: The Perils and Held Covered Clauses, 41 Tulane L. Rev. 259, 265 et seq. (1967). This last definition of "peril of the sea" adopted by the Second Circuit in *Gray,* predicating an insured loss upon an element of fortuity, in controlling here.

The *Gray* approach, while clearly more expansive than the older, extraordinary occurrence test, is not all encompassing. The element of fortuity, a chance event or occurrence, an uncommon and unanticipated happening, must be present. This point was clearly made by Judge Rifkind in Compania T. Centro-America

---

4. The "Perils" clause contained in the instant policies provides as follows:

Touching the adventures and perils which the Company is content to bear and take upon itself, they are of the Harbors, Bays, Sounds, Seas, and Masters as above named, Fire, Explosion, Collision, Assailing, Thieves, Theft, of entire vessel, against jettison, barratry of the Masters and Mariners and all other like Marine perils, losses and misfortunes that shall come to the hurt, detriment, or damage of the said vessel or any part thereof.

The "Inchmaree" clause states:

This insurance also to cover loss of or damage to hull or machinery directly caused by the following:

Accidents in going on or off, or while on drydocks, graving docks, ways, gridirons or pontoons;

Bursting of boilers, breakage of shafts or any *latent defect in the machinery or hull* (excluding the cost and expense of replacing or repairing the defective part); Negligence of Master, Mariners, Engineers, Pilots, or repairers other than the Assured's; Vandalism or malicious mischief; Provided such loss or damage has not resulted from want of due diligence by the owners of the vessel or by the Assured. [emphasis added]

v. Allied Assurrance Co., *supra,* wherein the Court stated:

> It does not follow that the insurer is liable for loss attributable to every incursion of sea water. The underwriter may show that the loss was not caused by a peril of the sea but . . . by the inherent unfitness of the vessel . . . [or] by the exhaustion of the vessel's useful life through wear and tear. . . . [citations omitted]

50 F.Supp. at 990, (cited with approval by the Court in *Gray*). *See also,* Spooner v. Connecticut Fire Ins. Co., *supra,* 314 F.2d at 756; 2 Arnould, *supra,* § 759 et seq.; 11 Couch, *supra,* §§ 43:112 and 43:114. Stated differently, the fortuitous occurrence test for a peril of the sea is not so broad as to include events which are certain to happen.

> Insurance policies cover only risks, not certainties. Therefore, a policy insuring against "perils of the sea" covers only fortuitous events resulting in loss, rather than events which must happen. Perils of the sea must be "of the sea" and not merely "on the sea." Where omissions of the owner-assured and his friends on board are the sole direct, effectual and proximate cause of the sinking, there is no loss by "peril of the seas."

Wigle v. Aetna Cas. & Sur. Co., 177 F. Supp. 932, 933 (E.D.Mich.1959). *See also,* Commercial Union Ins. Co. of New York v. Daniels, 343 F.Supp. 674, 677 (S.D.Tex.1972); King v. Liverpool & London & Globe Ins. Co., 37 Misc.2d 822, 238 N.Y.S.2d 799 (City Ct., Poughkeepsie 1962).

The leading English cases and authorities similarly view the term "peril of the sea" as embracing only fortuitous accidents or casualties of the seas, unforeseen and unexpected events, and as excluding losses occasioned by the incursion of water into a vessel's hull owing to the defective, deteriorated or decayed condition of the hull or ordinary wear and tear. P. Samuel & Co., Ltd. v. Dumas, [1924] All.E.R. 66 (H.L.); The Xantho, (1887) 12 App.Cas. 503 (H.L.); Mountain v. Whittle, [1921] 1 A.C. 615 (H.L.); Canada Rice Mills, Ltd. v. Union Mar. Ins. Co., [1940] 4 All.E.R. 169 (H.L.); Grant Smith & Co. and McDonnell Ltd. v. Seattle Construction and Dry Dock Co., [1920] A.C. 162 (P.C.); Sassoon & Co. v. Western Assur. Co., 12 Asp. 206 (P.C.1912); Wadsworth Lighterage & Coaling Co., Ltd. v. Sea Ins. Co., Ltd., 34 Lloyd's List L.R. 285 (C.A. 1929). *See also,* 2 Arnould, supra, §§ 759–762 and 800 et seq; Ivamy, supra, pp. 149 et seq. The following passages, taken from several of the foregoing English authorities, well illustrate the "peril of the sea" concept.

> . . . [T]he damage was not due to a sea peril at all, but was solely due to the weakness of the hull. . . . There was no weather, nor any other fortuitous circumstance, contributing to the incursion of the water; the water merely gravitated by its own weight through the opening in the decayed wood. . . . It would be an abuse of language to describe this as a loss due to perils of the sea. Although sea water damaged the goods, no peril of the sea contributed either proximately or remotely to the loss. There is ample authority for so holding, but it is sufficient to cite the judgment of Lord Herschell in THE XANTHO (sup.), where he says: "I think it clear that the term 'perils of the sea' does not cover every accident or casualty which may happen to the subject-matter of the insurance on the sea. It must be a peril 'of' the sea. Again it is well settled that it is not every loss or damage of which the sea is the immediate cause that is covered by these words. They do not protect, for example, against that natural and inevitable action of the winds and waves which results in what may be described as wear and tear."

Sassoon & Co. v. Western Assur. Co., *supra,* 12 Asp. at 207.

> Now, in these circumstances, I think it is not one of the cases where you can say, as has been suggested, that

the barge has been lost from an unexplained cause. The cause is not unexplained; it is obvious that water came through the seams, and if you want to know why water came through the seams it seems to me quite sufficient to say that this is a very old barge which has been bumping about in the Mersey for a long time and it has at last come to the end of its tether.

. . .

. . . The learned Judge, finding that the sinking of the barge was due to its own inherent weakness, has decided that there is no total loss by perils of the sea, though the barge was actually sunk because of the entry of sea water into it. There is no appeal with regard to that, and it seems to me to be in accordance with the law as now laid down in Samuel v. Dumas, [1924] A.C. 431; 18 Ll.L Rep. 211, that the effect of the entry of sea water into a ship is not in itself a peril of the sea. . . .

Wadsworth Lighterage & Coaling Co., Ltd. v. Sea Ins. Co., *supra*, 34 Lloyd's List L.R. at 287.

. . . It is, however, necessary for the assured to establish that the loss was due to a peril of the seas. If the water was in a normal condition and got into the houseboat simply owing to the defective character of the seams there would be no loss by peril of the seas—the loss would have been by the defective condition of the vessel. A loss caused by the entrance of sea water is not necessarily a loss by perils of the seas. There must be some special circumstance such as heavy waves causing the entrance of the sea water to make it a peril of the seas. . . .

Mountain v. Whittle, *supra*, [1921] 1 A. C. at 615 (opinion of Viscount Finlay).

The damage caused by springing a leak is not a charge upon the underwriters, unless it be directly traceable to some fortuitous occurrence . . . where the leak arises from the unseaworthy state of the ship

when sailed, or from wear and tear or natural decay and is only a consequence of that ordinary amount of straining to which she would unavoidably be exposed to [in the ordinary course of events], the underwriter is not liable.

2 Arnould, *supra*, § 761 at 761–762.

■ The foregoing cases and authorities establish the rule of law applicable to the instant case. That rule may be stated in the following terms: A loss is occasioned by a peril of the sea when it results from the fortuitous (unforeseen and unanticipated) action of the sea. A loss is not occasioned by a peril of the sea when it results from the defective, deteriorated or decayed condition of the vessel or from ordinary wear and tear.

■ Applying this test to the facts of this case, the court finds that the sinking of the GREEN LION was not the result of a fortuitous entry of water into the hull; it was an event which had to happen because of the deteriorated condition of the metal fastening which secured the vessel's keel and keelson to its hull. The evidence demonstrates that the separation of the keel and keelson from the hull was inevitable and was not an occurrence peculiar to the sea. The GREEN LION did not sink as the result of a peril of the sea, and, therefore, plaintiff can not have recovery under the "Perils" clause of the instant policies.

### The "Inchmaree" Clause

■ Plaintiff also predicates a recovery herein upon the "Inchmaree" clause of the instant policies. He asserts, *inter alia*, that the sinking of the GREEN LION resulted from a latent defect in the vessel's machinery or hull and that he had exercised all due diligence otherwise necessary to avoid the loss. The court finds that the loss did not result from a latent defect and, therefore, does not reach the due diligence requirement.

To support a recovery under the "Inchmaree" clause, plaintiff has called to the court's attention four principal

cases: Tropical Marine Products v. Birmingham Fire Insurance Co., 247 F.2d 116 (5th Cir.), cert. denied, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957); Mattson v. Connecticut Fire Insurance Co. of Hartford, 80 F.Supp. 101 (D.Minn.1948); Carter Tug Service v. Home Insurance Co., 345 F.Supp. 1193 (S.D.Ill.1971); and Saskatchewan Government Insurance Office v. The Spot Pack, 242 F.2d 385 (5 Cir. 1957). In each of these cases recovery was allowed after a finding that a latent defect, present in the vessel, had produced the loss. In *Tropical Marine* the loss was caused by a leak which was located in an area in which it could neither be investigated nor determined, 247 F.2d at 120–121, and in *Mattson* the beaching of the vessel had obliterated any possible chance of determining a cause other than that of a latent defect. 80 F.Supp. at 106. The *Spot Pack* met her demise as the result of a circuit breaker being omitted from her electrical system, a latent defect, 242 F.2d at 387, and in *Carter Tug* recovery was allowed when the vessel's bilge pumps failed to function and *only* the crew had acted negligently. 345 F.Supp. at 1203–1204.

On its facts, the instant case is plainly distinguishable from those above cited. The GREEN LION sank as the result of the incursion of water into her hull. Water was allowed to enter the vessel because the deteriorated metal fastenings which secured the keel and keelson to the hull had weakened and had allowed a separation to occur. These fastenings and the metal assisting frames had deteriorated from age, wear and lack of maintenance, but were not shown to be inherently defective in their original construction. Plaintiff had knowledge of the condition of these metal supports by virtue of the specific recommendations for their repair, reconditioning or replacement contained in the 1966 condition survey report. Plaintiff was further aware of their condition because, as he testified at trial, he had performed certain work in an effort to restore the fastenings. In view of this proof, the loss of the GREEN LION cannot, as a matter of law, be said to have resulted from a latent defect.

■ A latent defect is a defect which a reasonably careful inspection would not reveal. Reisman v. New Hampshire Fire Ins. Co., 312 F.2d 17, 20 (5 Cir. 1963). It is not a gradual deterioration but rather a defect in the metal itself. Waterman S. S. Corp. v. United States S. R. & M. Co., 155 F.2d 687, 691 (5 Cir.), cert. denied, 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656 (1946). In *Tropical Marine, supra,* the Court stated that the classic meaning of the term "latent defect" was as follows:

"A latent defect is one that could not be discovered by any known or customary test," . . . and "* * * is a hidden defect and generally involves the material out of which the thing is constructed as distinguished from the results of wear and tear." . . . It is "A hidden defect * * * not manifest, but hidden or concealed, and not visible or apparent; a defect hidden from knowledge as well as from sight; * * * a defect which reasonably careful inspection will not reveal; one which could not have been discovered by inspection * * * by any known and customary test." [citations omitted]

247 F.2d at 121. *See also,* Spooner v. Connecticut Fire Ins. Co., *supra,* 314 F.2d at 757–759; Compania T. Centro-America v. Alliance Assur. Co., *supra,* 50 F.Supp. at 992; Mellon v. Federal Ins. Co., 14 F.2d 997 (S.D.N.Y.1926); 11 Couch, *supra,* § 43:84; Buglass, *supra,* at 82–84; Tetreault, The Hull Policy: The "Inchmaree" Clause, 41 Tulane L. Rev. 325, 336–338.

The GREEN LION's defective and deteriorated metal fastenings were not, under the above definitions, latent in nature; they were clearly patent. They were observable and had been observed. They were accessible and access to them had been obtained by plaintiff, who had made an attempt to restore them. They were not hidden or unknown, but rather

were fully revealed in the 1966 condition survey report. They were not defects inherent in the metal, but were rather the result of 27 years of use. As such, the court concludes that the vessel did not sink as the result of a latent defect as that term is employed in the "Inchmaree" clause of the instant policies.

### CONCLUSION

The sinking of plaintiff's yacht, the GREEN LION, did not result from a peril or defect insured against by the defendants in the Time Hull policies presently at bar. Therefore, the complaint is dismissed, with prejudice. Let the Clerk of the Court enter judgment, with costs, accordingly.

The foregoing constitute the findings of fact and conclusions of law of the court, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

So ordered.