United States Court of Appeals,

Fifth Circuit.

No. 94-40021.

Summary Calendar.

THANH LONG PARTNERSHIP, Plaintiff-Appellant,

v.

HIGHLANDS INSURANCE COMPANY, Defendant-Appellee.

Sept. 19, 1994.

Appeal from the United States District Court for the Western District of Louisiana.

Before GARWOOD, SMITH and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

This insurance dispute arises from the ill-fated and final voyage of the M/V BIG TOM, a Florida-style double rig shrimp trawler which sank in the Gulf of Mexico at Vermillion Block 122-A. Thanh Long Partnership (Thanh Long), the vessel owner, sued Highlands Insurance Company (Highlands), its maritime hull insurer, claiming that the BIG TOM was lost due to the master's operational negligence, which is a covered peril under the Inchmaree Clause of the policy. Highlands denied coverage, claiming alternatively that (1) the vessel was intentionally scuttled; (2) the owners breached an express warranty requiring an operable high water bilge alarm; or (3) the Inchmaree Clause did not provide coverage because the owners breached the implied warranty of continuing seaworthiness, demonstrating a lack of due diligence. The district court denied coverage, finding that the BIG TOM did not sink due to a covered peril of the sea. Because we find the district court's findings of

fact and conclusions of law amply supported by the evidence, we affirm, although we navigate a slightly different legal course to reach that destination.

## Insured Perils of the Sea

Thanh Long insured the BIG TOM under the Highlands maritime hull policy in the amount of $150,000. The policy includes an express warranty obligating Thanh Long to install and maintain in an operable condition a high water bilge alarm system.[1] The Highlands policy also includes an Inchmaree clause. An Inchmaree clause significantly expands the hull insurer's undertaking by specifying coverage for a variety of perils in addition to the "adventures and perils" of the sea specified in the ancient language of the standard form policy. Highland's Inchmaree clause provided, in relevant part, that the policy insured against "latent defects in the machinery or hull" and against operational negligence committed by the "master, mariner, engineer or pilot." Excluded from coverage under the Inchmaree clause, however, is any loss caused by a lack of due diligence on the part of the "assured, the owner or manager of the vessel or any of them." The policy also obligated Thanh Long to comply with any recommendations made by marine surveyors hired by Highlands as soon as practicable and,

---

[1]The "Special Terms and Conditions" of the policy includes the following conspicuous provision:

*HIGH WATER BILGE ALARM SYSTEM*

Warranted that a high water bilge alarm system is installed in the engine room, fully audible in the pilot house and maintained in an operative condition.

in any event, before any further fishing operation.

## The Loss of the BIG TOM

BIG TOM was owned by the Thanh Long Partnership which was in turn owned 50 percent by Quang Tran and 50 percent by Nguyet D. Le. Nguyet Le's husband, Son Le, was the initial purchaser and business manager of the vessel.[2] He conducted quarterly inspections and was responsible for the purchase and installation of electrical equipment, including the high water bilge alarm. Quang Tran generally acted as master of the vessel on fishing voyages but Son Le's testimony established that Quang Tran was also responsible for equipment used in shrimping, some maintenance on shore, and preparations for voyage.

At about mid-day on November 30, 1990 the BIG TOM left port at Intercoastal City for a two-week fishing trip with master/owner Quang Tran (Tran) and two other crew members on board. After motoring six hours, the vessel reached Vermillion Block 122-A, about 30 miles offshore, and tied off to an uninhabited oil platform for the night because Tran determined that the four- to six-foot seas were too rough for shrimping.

After tying the boat off to the platform, Tran testified that he began using the vessel's sea water piping system to clean the boat. The plumbing system included a suction pump and three gate valves: (1) the sea suction valve opened to allow sea water to be sucked through the suction pump near the bilge; (2) the deck gate

---

[2]Highlands contends that BIG TOM was placed in Nguyet Le's name to evade Coast Guard regulations because Son Le was not a United States citizen.

3

valve opened to allow the flow being discharged from the pump to be released into hoses for cleaning: and (3) the bilge suction valve, when opened, allowed the suction pump to be used to evacuate water from the bilge for discharge overboard. A marine surveyor hired by the Highlands had recommended the installation of an additional valve, a check valve, on the bilge suction line to prevent sea water from entering the bilge if, by some error, both the sea suction valve and the bilge suction valve were left open. Thanh Long claims that it did install the recommended valve.

Tran testified that on the evening of November 30 he first opened the sea suction valve and the deck gate valve to use sea water to wash down the deck and the fish hold. Tran gave differing accounts explaining what he did after he finished cleaning the deck and fish hold. In his initial statement, he claimed not to have pumped any water from the bilge that night because it was not needed. At trial, however, he testified that he did pump the bilges, at the same time removing the check valve from the bilge suction line to facilitate faster flow.

After Tran completed his washdown operations, he retired for the evening at about 11 p.m. Near 4 a.m. a member of the crew woke Tran because the deck light was flickering and there was a foul smell. The two men went to the engine room where they discovered that the engine room had taken on a substantial amount of water, enough to cover the bilge suction valve and half the generator. Tran and the two crew members then abandoned ship by swimming to the platform where they waited several hours until oil workers

4

arrived who called the Coast Guard.  Later that morning the Coast Guard delivered two pumps and Tran and another crew member returned to the BIG TOM, which was at that point still afloat.  While the men tried to pump the vessel the BIG TOM rolled, the men abandoned ship, and the BIG TOM finally sank.  It is undisputed that from start to finish the high water bilge alarm system never sounded.

## The Evidence

Divers hired to investigate the wreck found that the sea suction valve, the deck gate valve and the bilge suction valve were all in the open position.  The divers also located and retrieved the bilge suction line, which was found to be without a check valve.  The district court found that, contrary to the testimony of Son Le and Quang Tran, the condition of the suction line was such that it did not support any claim that a check valve had ever been installed.  The consequence of leaving all three valves open and the absence of a check valve on the bilge suction line would be that water could flow freely from the sea into the bilge of the vessel.  Credible expert testimony established that there was no legitimate reason for opening all three gate valves at the same time.

The district court held that the Inchmaree clause did not cover loss of the BIG TOM because Tran demonstrated a lack of due diligence by knowingly permitting the BIG TOM to break ground on November 30 in an unseaworthy condition.  *See Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.,* 242 F.2d 385 (5th Cir.1957) (stating that although an Inchmaree clause clearly insures against

5

some forms of unseaworthiness, there exists a modified implied warranty which prohibits the owner from knowingly permitting an unseaworthy vessel to break ground).  The court found unseaworthiness was based on its fact findings that, when the vessel sailed on November 30, Quang Tran knew that it sailed without a check valve on the bilge suction line and without an operable high water bilge alarm.

Although Thanh Long contends that the check valve was present when the BIG TOM sailed, it concedes in its brief that the high water bilge alarm did not sound because, "of the two wires to the horn, one had corroded and come off."  The bilge alarm consisted of a float mechanism in the bilge and a horn mounted in the pilothouse.  If water rose above a certain level in the bilge, a mercury switch in the float connected and the alarm would sound.  According to Son Le, the float assembly was anchored with a piece of angle iron.

The divers investigating the wreck did not find either the float or the angle iron used to anchor the assembly, although over three and one-half hours were expended in two separate dives searching for the equipment in the engine room, which measured approximately 10 feet by 10 feet.  The diver testified that, based on his past experience with similar wreckage, the equipment would have been located if it had been in the engine room.  The diver did locate and videotape the horn in the pilothouse, noting that one of the essential wires was corroded and disconnected.  Although the investigative dive occurred some six months after the BIG TOM sank,

6

the diver testified that such corrosion exceeded what would typically occur underwater in that period. No one testified that the alarm did sound the night BIG TOM sank. Thanh Long did not offer any evidence suggesting that the horn wire was disconnected or the float mechanism was displaced from the bilge after the BIG TOM left port. Based on this evidence and other evidence in the record, we hold that the district court did not clearly err in its factual finding that the BIG TOM left Intercoastal City without an operable bilge alarm.

Son Le testified that he tested the high water bilge alarm personally sometime between November 22 and November 30, when the BIG TOM left Intercoastal City. He stated that he examined the wires to be sure none were disconnected. He further testified that standard procedure required Quang Tran to check operation of the bilge alarm, including the horn, prior to embarking on a voyage, and that the wires to the horn could be easily seen in the pilothouse. Quang Tran testified that he "checked everything" before leaving Intercoastal City. Although the record does not contain abundant evidence that Quang Tran or Son Le knew that the bilge alarm was inoperable before the BIG TOM left Intercoastal City, we are not left with the firm and definite conviction that an error has been made. *See Glass v. Petro-Tex Chemical Corp.,* 757 F.2d 1554, 1559 (5th Cir.1985) (a finding is not clearly erroneous unless reviewing court is left with a firm and definite conviction that a mistake has been committed). If these owners conducted the investigation they claim, the loose wire would have been

7

discovered. There is no indication that the wire became loose in the 12 or so hours between the time the vessel departed Intercoastal City and the time it began sinking. The trial judge, who heard all the testimony, was entitled to infer from the evidence presented that these owners knew the alarm was inoperable. We therefore hold that the district court did not clearly err in finding that Quang Tran knowingly permitted the BIG TOM to break ground in an unseaworthy condition.

Implied Warranty of Seaworthiness and the Inchmaree Clause

Thanh Long argues that the predominant cause of the sinking was Quang Tran's negligence in removing the check valve and opening all three gate valves before retiring for the night. Since Tran was acting in his capacity as master rather than as owner of the vessel, and since the Inchmaree clause covers negligence of the master, Thanh Long contends that the Inchmaree clause provides coverage. This Court has never recognized the functional master/owner distinction urged by Thanh Long. The cases cited by Thanh Long reclassified part owners as masters for purposes of the Inchmaree clause only when the master/owner was discharging some professional duty in navigating the vessel *at sea*. *Allen N. Spooner & Son, Inc. v. Connecticut Fire Ins. Co.,* 314 F.2d 753 (2d Cir.1963), *cert. denied,* 275 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963) and *Read v. Agricultural Ins. Co.,* 219 Wis. 580, 263 N.W. 632 (1935). Even if this Court were willing to recognize such a distinction as to Tran's alleged removal of the check valve while tied off to a platform performing what were basically dockside

8

activities, we would not extend it to Thanh's shoreside decision to proceed without an operable bilge alarm. We hold that Quang Tran, as owner, knowingly permitted the BIG TOM to proceed without an operable high water bilge alarm, rendering the vessel unseaworthy and demonstrating a lack of due diligence which removed the casualty from coverage under the Inchmaree clause.

Ordinarily, the law of the state where the contract was formed governs construction of marine insurance contracts, except where the state law is displaced by admiralty law. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). Thanh Long argues that *Wilburn Boat* therefore requires this Court to apply Louisiana law, which prohibits implied warranties in insurance policies. We find this argument unpersuasive. Entrenched federal precedent exists on the implied warranty of seaworthiness and the interpretation of Inchmaree clauses in maritime insurance contracts, which displaces Louisiana law and makes *Wilburn Boat* inapplicable to the seaworthiness issue. *E.g., Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.,* 242 F.2d 385 (5th Cir.1957); *see also 5801 Assoc., LTD. v. Continental Ins. Co.,* 983 F.2d 662, 666 (5th Cir.1993) ("entrenched federal precedent exists on the interpretation of the Inchmaree clause"). We hold that federal admiralty law displaces state law as to the implied warranty of seaworthiness in maritime insurance contracts.

## Breach of Express Warranty

Although we affirm the district court's finding that vessel owner Quang Tran knowingly permitted the BIG TOM to depart

9

Intercoastal City on November 30, 1990 without an operable bilge alarm, we need not rest our decision, as the district court did, on the modified implied warranty of seaworthiness that survives an Inchmaree clause. By sailing without an operable high water bilge alarm, Thanh Long breached its express warranty to maintain an operable alarm which voids coverage altogether and makes application of the Inchmaree clause to this dispute unnecessary.

Breach of the express warranty in this maritime insurance policy voids coverage under either Louisiana law or federal maritime precedent. Assuming Louisiana law applies, the Court must then determine whether the express warranty is ambiguous. *Graham v. Milky Way Barge, Inc.,* 824 F.2d 376, 380-81 (5th Cir.1987). The parties raise no argument, nor does there appear to be room for any, that the Highlands clause is ambiguous. Under Louisiana law, breach of an unambiguous express warranty in a maritime policy operates to void coverage unless statutory provisions dictate a different result. *Milky Way Barge,* 824 F.2d at 383; *see also Steptore v. Masco Construction Co.* 619 So.2d 1183, 1186 (La.App. 1st Cir.1993). Appellant Thanh Long does not offer nor has this Court found any Louisiana statutes which alter the result as to this marine policy. Therefore, we hold that Thanh Long's breach of the express warranty to maintain an operable high water bilge alarm voids coverage as to this casualty.

Breach of warranty, either express or implied, is insufficient to deny recovery unless the breach is also the cause of the loss. The district court found that even if Quang Tran had

10

negligently opened all three gate valves the vessel would not have sunk if there had been an operable high water bilge alarm. After reviewing the record, particularly the expert testimony, we agree that it is more likely than not that the crew would have been able to prevent the total loss of the BIG TOM if they had received the early notice of the problem that would have been provided by an operable bilge alarm system. Testimony established that the engine room had taken on a significant amount of water before the men were alerted to the danger and that they had to abandon ship almost immediately.

Allowing the BIG TOM to sail without an operable alarm breached Thanh Long's unambiguous and express warranty to maintain such an alarm in an operable condition. Breach of the express warranty caused the loss of the BIG TOM. Coverage was, therefore, void as to this casualty. The decision of the district court is AFFIRMED.