**UNDERWRITERS AT LLOYD'S and the Cox Syndicate at Lloyds, Plaintiffs,**

v.

**Carlos LABARCA, Defendant.**

**No. Civ. 99–1852(JP).**

United States District Court, D. Puerto Rico.

June 15, 2000.

might put into question the validity of Canetti's and Curet's privileges at HIMA.

José F. Sárraga Venegas, San Juan, PR, for plaintiff.

Carlos J. Quilinchini, Hato Rey, PR, for defendants.

### OPINION AND ORDER

PIERAS, Senior District Judge.

## I. INTRODUCTION

The Court has before it Plaintiffs' Motion for Summary Judgment (**docket No. 23**) and Defendant's Opposition thereto (docket No. 33). Plaintiffs Underwriters at Lloyd's and the Cox Syndicate at Lloyd's bring this action for declaratory judgment, to obtain a declaration from the Court as to its obligations under a marine insurance policy issued to Defendant Carlos Labarca for a sport fisherman vessel, GYPSY. For the reasons outlined below, the Court hereby **GRANTS** Plaintiffs' motion.

## II. UNCONTESTED FACTS

1.  Underwriters at Lloyd's was and still is an insurance company organized and existing under the laws of the United Kingdom, with its principal place of business in the city of London, and is represented by its member, The Cox Syndicate.

2.  The Cox Syndicate issued a contract of marine insurance for one hundred seventy thousand dollars ($170,000.00) to Mr. Carlos Labarca, Policy No. 98AM 590–301, [hereinafter referred to as the "Policy"], effective date July 15, 1998 and expiration date July 15,

1999, covering the vessel 1979 48' Egg Harbor, Hull Id. PAC 48607M79H.

3. Carlos H. Labarca was and still is an individual and a resident of Bayamón, Puerto Rico, and is the President of Labarca Construction.

4. Carlos H. Labarca was and still is the owner of a 48 foot sport fisherman vessel, named "GYPSY," hull identification No. PAC 48607M79H.

5. That on or about June 5, 1999 the vessel M/V GYPSY sank while moored at Slip "A–74," at the San Juan Bay Marina, Inc.'s facilities, San Juan Harbor, San Juan, P.R.

6. On June 7, 1999, Mr. Carlos Labarca reported to marine underwriters via his insurance broker that the M/V GYPSY sank at the dock at the San Juan Bay Marina on June 5, 1999.

7. The Policy names Labarca as the assured/insured and a loss payee.

8. Under the Policy, Lloyd's agreed, subject to various terms and conditions, to pay Labarca for direct physical loss or damage to the Vessel resulting from any external cause.

9. The Policy provides at DEFINITIONS, that

"Warranty" is a term of the policy whereby the Insured Person undertakes to do or not to do something or to fulfill some condition, or by which a Warranty exists as to a particular state of fact. If the Insured Person does not strictly comply with the terms of a Warranty, cover under this policy may not exist or cease and any loss that occurs at that time or thereafter may not be paid."

10. The Policy provides at Section A, HULL; EQUIPMENT AND ACCESSORIES INSURANCE, (2) PERILS INSURED, that

"Subject to all the terms and provisions in this policy of insurance, we will pay for direct physical loss or damage to the Vessel from any external cause, including direct physical loss or damage to the Vessel caused by any hidden defect (excluding the cost of repair or replacement of the defective part) minus any applicable deductible shown on the Declaration Page."

11. The Policy provides at Section A, HULL; EQUIPMENT AND ACCESSORIES INSURANCE, (3) EXCLUSIONS, that

"Nevertheless, we will not pay for any damage or loss of the Vessel or Personal Effects caused, in whole or in part, by:

A. ...

B. ...

C. ...

D. Your failure to maintain the Vessel in a sound and reasonably fit condition; or loss or damage occurring during or resulting from repairs, restoration or remodeling".

12. Carlos Labarca had a mooring agreement with San Juan Bay Marina, Inc. for the vessel M/V GYPSY at Slip "A–74."

13. The vessel M/V GYPSY is equipped with four (4) air-conditioning units.

14. The vessel's four (4) air-conditioning units operate with a 120 volt General Electric brand½ HP air-conditioning raw water supply pump, which is fitted with a Obedorfer brand Model 104M pump head.

15. The Obedorfer brand Model 104M pump head operates at 3,450 RPM and has a flow rate of approximately 76 gallons per minute, which discharges overboard.

16. Days prior to the sinking, two (2) of the vessel's four (4) air-conditioning compressors were removed from the vessel by a mechanic engaged by the owner.

17. The Obedorfer brand Model 104M pump head (the air-conditioning raw water supply pump) supplies raw cooling seawater to each of the four (4) air-conditioning via four (4) hoses;

two hoses are colored red and two hoses are colored black.

18. The two (2) hoses from the air-conditioning raw seawater supply pump to both of the air conditioning units that were removed were left unsealed by the mechanic prior to the sinking.

19. The raw seawater is discharged from the air conditioner units overboard through-hull fittings.

20. The raw seawater discharge hoses for both of the air conditioner compressors that were removed from the vessel were unsealed at the ends which would have been attached to the units. The other ends were connected to a "Y" fitting to a through-hull fitting on the port side.

21. The vessel has three (3) three quarters inch (3/4″) inner diameter uncapped and open through hull fittings in the transom which are located 5.75 inches above the load waterline.

22. The vessel has four (4) through-hull fittings in the starboard side, which are located 2.75 inches above the vessel's load waterline, and that are positioned from forward working aft, as follows:

(a) a three quarters inch (3/4″) inner diameter fitting connected to a ribbed hose;

(b) a one inch (1″) inner diameter fitting (with a valve) connected to a black rubber hose;

(c) a three quarters inch (3/4″) inner diameter fitting connected to a "Y" fitting which is attached to two (2) hoses;

(d) a one inch (1″) inner diameter fitting attached to a two inch forty five degree elbow with a threaded open end.

23. The vessel has two (2) through-full fittings in the port side which are located 5.5 inches above the vessel's load waterline and that are positioned from forward working aft, as follows:

(a) a one inch (1″) inner diameter fitting attached to a 2 inch forty five (45) degree elbow that is capped;

(b) a three quarters inch (3/4″) inner diameter fitting connected to a "Y" fitting which is attached to the two hoses described in 22 above.

24. The vessel was equipped with four A.C. Delco size 8D twelve volt (12V) batteries.

25. The vessel was fitted with three (3) Rule 2000 brand twelve volt (12V) bilge pumps each equipped with float switches. Each of these bilge pumps has the capability of pumping two thousand (2000) gallons per hour (gph).

26. The vessel is fitted with two Rule 800 pumps which are used to pump out the shower drain pumps.

27. Following the sinking, the Owner was sent letters by Mr. John Ordon, underwriter's agent, which recommended the owner to conduct a sale of the vessel.

## III. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Mack v. Great Atl. and Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989).

The party filing a motion for summary judgment bears the initial burden of proof to show "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue for trial. *See First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Goldman v. First National Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993). In discharging this burden, the non-movant may not rest upon mere allegations or denials of the pleadings. *See* Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."). On issues where the non-movant bears the ultimate burden of proof, it must present definite, competent evidence to rebut the evidence put forth by the moving party. *See Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514–15.

## B. Interpretation of the Insurance Policy

At issue is the interpretation of the marine insurance policy held by Defendant Labarca. Plaintiffs contend that they are entitled to the entry of a declaratory judgment in their favor based on two clauses in the insurance policy. First, Plaintiffs argue that Defendant breached a warranty to maintain the vessel in a seaworthy condition at all times ("seaworthiness clause"). Second, Plaintiffs assert that the clause excluding coverage for loss or damage occurring during repairs, restoration or remodeling of the vessel ("repairs clause") precludes Defendant's recovery under the policy. The Court will limit its discussion to the seaworthiness clause, as it finds that construction of this clause alone disposes of the case.

As a threshold matter, the Court must determine whether federal or state law governs the construction of the seaworthiness clause in a marine insurance contract. An action on a marine insurance policy brings it within federal jurisdiction by virtue of the Admiralty Clause of the United States Constitution. *See* U.S. Const., art. III, § 2. Notwithstanding, the law of the state where the contract was formed generally governs the construction of marine insurance contracts. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 313–14, 75 S.Ct. 368, 99 L.Ed. 337 (1955); *Thanh Long Partnership v. Highlands Ins. Co.,* 32 F.3d 189, 193 (5th Cir.1994). Where an established federal admiralty rule exists, however, the federal rule displaces state law. *See Wilburn Boat,* 348 U.S. at 314, 75 S.Ct. 368.

In *Wilburn Boat,* the U.S. Supreme Court observed that the regulation of the insurance industry traditionally had been considered the province of the states. For this reason, the Court expressed a reluctance to create admiralty rules to govern the terms of marine insurance policies. *Id.* at 316, 75 S.Ct. 368. With regard to the construction of a warranty of seaworthiness in a marine insurance contract, however, it is well established that federal admiralty law governs, and thereby displaces state law. *See Thanh Long Partnership,* 32 F.3d at 193–94.

The seaworthiness clause in the insurance policy at issue provides:

> It is Warranted by the Insured Person that the Vessel shall be maintained in a seaworthy condition at all times. In the event of a loss or damage affecting the seaworthiness of the Vessel, the Vessel shall be restored to a seaworthy condition as soon as reasonably possible and the Vessel will not be operated pending completion of such repair without Our express written approval.

(Dft's Opp. to Mot. for Summary Jmt., App. I). Although at first blush the clause appears to be an express warranty of sea-

worthiness, the Fifth Circuit has found nearly identical language to constitute "an exclusion which purports to deny coverage in situations wherein there has been a breach of the continuing negative warranty of seaworthiness implied by law." *Insurance Co. of North Am. v. Board of Comm'rs*, 733 F.2d 1161, 1165 (5th Cir. 1984). In other words, this language operates to deny coverage where the insured breaches the implied warranty of seaworthiness. Every marine insurance policy contains an implied warranty of seaworthiness. *See The Caledonia*, 157 U.S. 124, 132, 15 S.Ct. 537, 541, 39 L.Ed. 644 (1895). This Court agrees that the seaworthiness clause in the insurance policy at issue codifies the implied warranty of seaworthiness; the parties do not contest this legal conclusion.

■ To satisfy the insured's obligation under this warranty, the vessel must be "reasonably fit for its intended use." *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 3 (1st Cir.1999) (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *Ferrara v. A. & V. Fishing, Inc.*, 99 F.3d 449, 453 (1st Cir.1996)). If a vessel is seaworthy when the insurance policy is issued, the vessel is generally presumed to continue to be seaworthy. *See Pace v. Insurance Co. of N. Am.*, 838 F.2d 572, 577 (1st Cir.1988). An insurer attempting to deny coverage by alleging unseaworthiness of the vessel bears the burden of proof in overcoming this presumption. *See id.; Saskatchewan Gov't Ins. Office v. Spot Pack*, 242 F.2d 385, 388–89 (5th Cir., 1957). To prevail, the insurer not only must prove that the vessel was unseaworthy, but also that such unseaworthiness was the proximate cause of the loss. *See Pace*, 838 F.2d at 577; *Spot Pack*, 242 F.2d at 388–89.

■ Plaintiffs contend that the vessel sank because it was unseaworthy, and that the sinking of the vessel was proximately caused by the unseaworthy condition. In support of their contention, Plaintiffs rely on well-settled law that a vessel is pre-

sumed to be unseaworthy if it sinks in calm waters. *See Pace*, 838 F.2d at 577; *see also Reisman v. New Hampshire Fire Ins. Co.*, 312 F.2d 17, 20 (5th Cir.1963); *Boston Ins. Co. v. Dehydrating Process Co.*, 204 F.2d 441 (1st Cir.1953). Defendant admits that the vessel sank in calm waters, but argues that coverage should not be denied because the unseaworthy condition was caused by a latent defect. *See Sipowicz v. Wimble*, 370 F.Supp. 442, 448–49 (S.D.N.Y.1974).

■ A latent defect is "a defect which a reasonably careful inspection would not reveal." *Id.* at 449 (citing *Reisman*, 312 F.2d at 20). It is a defect in the item itself, not a lack of maintenance or a gradual deterioration. *See id.* The only evidence identified by Defendant for the proposition that the sinking was due to a latent defect, are (1) the results of a marine survey performed in June 1998 indicating that the vessel was in excellent condition and making no mention of a one-inch hole on the starboard side of the vessel, and (2) the deposition of Doug Wagner, the surveyor who investigated the June 1999 sinking of the vessel, wherein he states that he observed a one-inch opening existed on the starboard side of the vessel but could not determine its age, and that this hole was an unseaworthy condition. Based on this evidence, Defendant argues that it is possible that the hole was present during the June 1998 survey and not discovered, thereby making it a latent defect. Defendant also makes much of the fact that Labarca did not have actual knowledge of the unsealed hoses.

■ Defendant has not produced competent evidence revealing genuine issue of material fact as to the existence of a latent defect causing the unseaworthy condition. A one-inch hole in the hull of the starboard side of the vessel is not "hidden from knowledge as well as from sight" or "a defect which reasonably careful inspection will not reveal." *Sipowicz*, 370 F.Supp. at 449 (quoting *Tropical Marine Products v.*

*Birmingham Fire Ins. Co.*, 247 F.2d 116, 121 (5th Cir.), *cert. denied,* 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1946)). Defendant's theory relies heavily on conjecture, not on evidence. In essence, Defendant argues that assuming the one-inch hole was present during the June 1998 survey, and assuming that survey was a reasonably careful inspection, the fact that the hole was not discovered then means the hole is a latent defect. The only case Defendant relies on for this proposition is *Sipowicz,* in which a ship that sank due to the deterioration of metal fastenings securing the keel and keelson to the hull, allowing a separation to occur. The *Sipowicz* court called this condition "clearly patent" and "observable," thereby rejecting the plaintiff's arguments that the condition constituted a latent defect. *Id.* at 449. The court also observed that the plaintiff in that action had actual knowledge of the condition, this fact is hardly dispositive, as the definition of latency is objective, not subjective. *See id.,* 370 F.Supp. at 449. Thus, this Court hereby finds that Defendant has failed to present definite, competent evidence to rebut the presumption of unseaworthiness.

Furthermore, the uncontested facts, and uncontroverted evidence, support the conclusion that the vessel was unseaworthy at the time of its sinking, that the unseaworthiness was due primarily to the removal of two air conditioning compressors and Labarca's subsequent use of the air conditioner on the vessel while the hoses connecting to the removed compressors were left unsealed, and that the sinking of the vessel was proximately caused by this condition. It is uncontested that days prior to the sinking, two of the four air-conditioning compressors were removed from the vessel by a mechanic hired by Labàrca, and the two hoses connected to each of the two removed units were left unsealed. (Uncont. Facts Nos. 16–18).

The surveyors who investigated the cause of the sinking, Doug Wagner and Carlos Suarez, concluded in their prelimi-

nary report that the vessel sank due to the intrusion of sea water through two unsealed air-conditioner compressor hoses. According to that report, Labarca indicated to the surveyors that prior to the sinking of the vessel, he had been on-board operating the vessel's air conditioner, and left the air conditioner running upon disembarking the vessel. The air conditioner draws in raw seawater, and thus by leaving the air conditioner running, it continued to draw in raw seawater. Because two of the raw seawater discharge hoses had been removed and unsealed at the ends, the surveyor concluded that this condition caused the vessel to fill with water and sink. In his deposition, Labarca also admits that he probably turned on the air conditioning units two days prior to the sinking of the vessel. In the surveyors' supplemental findings, they reiterate their belief that the vessel sank for the reasons outlined in their preliminary report. They also noted that after performing a second survey of the vessel, the uncapped through-hull fittings, particularly on the starboard side, created a clearly unseaworthy condition. Defendant has not come forward with any evidence to create a genuine issue of material fact as to the unseaworthiness of the vessel at the time of its sinking, or as to the proximate cause of the sinking of the vessel.

## IV. Conclusion

In light of the foregoing, the Court hereby **GRANTS** Plaintiffs' motion for summary judgment.

**IT IS SO ORDERED.**